## UNITED STATES *v.* TEXAS.

### ORIGINAL.

No. 3.   Original.   Argued October 23, 24, 25, 1895. — Decided March 16, 1896.

The treaty between the United States and Spain, made in 1819, and ratified in 1821, provided that "the boundary line between the two countries, west of the Mississippi, shall begin on the Gulf of Mexico, at the mouth of the river Sabine, in the sea, continuing north, along the western bank of the river to the 32d degree of latitude; thence, by a line due north, to the degree of latitude where it strikes the Rio Roxo of Natchitoches, or Red River; then following the course of the Rio Roxo, westward, to the degree of longitude 100 west from London and 23 from Washington; then, crossing the said Red River, and running thence, by a line due north, to the river Arkansas; thence, following the course of the southern bank of the Arkansas, to its source, in latitude 42 north; and thence, by that parallel of latitude, to the South Sea. The whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, 1818." *Held,*

(1) That the intention of the two governments, as gathered from the words of the treaty, must control, and that the map to which the contracting parties referred is to be given the same effect as if it had been expressly made a part of the treaty;

(2) But, looking at the entire instrument, it is clear that, while the parties took the Melish map, improved to 1818, as a basis for the final settlement of the question of boundary, they contemplated, as shown by the fourth article of the treaty, that the line was subse-

1

quently.to be fixed with more precision by commissioners and surveyors representing the respective countries;

(3) That the reference in the treaty to the 100th meridian was to that meridian astronomically located, and not necessarily to the 100th meridian as located on the Melish map;

(4) That the Melish map located the 100th meridian far east of where the true 100th meridian is, when properly delineated;

(5) That the Compromise Act of September 9, 1850, and the acceptance of its provisions by Texas, together with the action of the two governments, require that, in the determination of the present question of boundary between the United States and Texas, the direction in the treaty, "following the course of the Rio Roxo westward to the degree of longitude 100 west from London," must be interpreted as referring to the true 100th meridian, and, consequently, the line "westward" must go to that meridian, and not stop at the Melish 100th meridian;

(6) That Prairie Dog Town Fork of Red River is the continuation, going from east to west, of the Red River of the treaty, and the line, going from east to west, extends up Red River and along the Prairie Dog Town Fork of Red River to the 100th meridian, and not up the North Fork of Red River;

(7) That the act of Congress of February 24, 1879, c. 97, creating the Northern Judicial District of Texas, is to be construed as placing Greer County in that district for judicial purposes only, and not as ceding to Texas the territory embraced by that county.

The territory east of the 100th meridian of longitude, west and south of the river now known as the North Fork of Red River, and north of a line following westward, as prescribed by the treaty of 1819 between the United States and Spain, the course, and along the south bank, both of Red River and the river now known as the Prairie Dog Town Fork or South Fork of Red River until such line meets the 100th meridian of longitude — which territory is sometimes called Greer County — constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that State into the Union, and is not within the limits nor under the jurisdiction of that State, but is subject to the exclusive jurisdiction of the United States of America.

Each party will pay its own costs.

By the act of May 2, 1890, c. 182, § 25, 26 Stat. 81, 92, the Attorney General of the United States was "directed to commence in the name and on behalf of the United States, and prosecute to a final determination, a proper suit in equity in the Supreme Court of the United States against the State of Texas, setting forth the title and claim of the United States

to the tract of land lying between the North and South Forks of the Red River where the Indian Territory and the State of Texas adjoin, east of the one hundredth degree of longitude, and claimed by the State of Texas as within its boundary and a part of its land, and designated on its map as Greer County."

This suit was commenced in compliance with that direction. A demurrer to the bill was heard and overruled at October Term 1891, (143 U. S. 621,) and the case was at this term heard upon its merits.

*Mr. Attorney General, Mr. Solicitor General* and *Mr. Edgar Allan* for the United States.

*Mr. George Clark, Mr. M. M. Crane* and *Mr. A. H. Garland* for the State of Texas. *Mr. Charles A. Culberson, Mr. George R. Freeman* and *Mr. H. J. May* were on the briefs for the State.

I. The map of Melish, improved to the first of January, 1818, made part of the treaty, conclusively establishes the claim of Texas to the territory in controversy, and known as Greer County.

The boundary line from the mouth of the Sabine River to the point where the line strikes the Rio Roxo of Natchitoches or Red River is not disputed, and that on the north and west of the State was settled by the act of September 9, 1850. This act of 1850 has no reference to the boundary line from the point where it intersects Red River, thence up that river to the 100th meridian and northward, or to the disputed territory. This is plain from the act itself, and it is expressly alleged in the bill. The case therefore turns upon that portion of the treaty providing, "then following the course of the Rio Roxo westward to the degree of longitude 100 west from London and 23 from Washington; then crossing the said Red River and running thence by a line due north to the river Arkansas," and "the whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, 1818."

Accepting the admission and argument of complainants' counsel, that unless the act of 1850 operates to settle the eastern boundary line of the State against her claim, the territory rightfully belongs to Texas, other facts make it indisputable that the act can be given no such effect.  In the first place, when this act was passed, the actual intersection of the 100th meridian with Red River had not been determined, and the meridian referred to in the act necessarily and logically was that shown on the map of Melish made part of the treaty. The title of the act shows that it is confined to the northern and western boundaries.  By the first section of the act Texas agreed that " her boundary *on the north* " should commence at the point of intersection of the 100th meridian with the parallel 36° 30', and by the second section ceded to the United States. " all her claim to territory *exterior* " to this line, thus clearly and undoubtedly ceding only territory *north* of this line. This is also shown by the controversy which led to the passage of this act ; for it is well known that it had no reference to the eastern boundary line of the State.  At that time the United States had not asserted any claim to Greer County, and did not do so till years afterwards.  The eastern boundary line of the State is regarded by the United States as that laid down by Melish on his map of 1818 ; the act of 1850 has been so construed by Congress.  By the act of the legislature of Texas of May 2, 1882, the United States were invited to appoint commissioners to mark the line thus defined, and the Congress accepted said invitation by the act of January 31, 1885, reciting the terms of the treaty of 1819, and directing the commissioners to " mark the point where the 100th meridian of longitude crosses Red River *in accordance with the terms of the treaty aforesaid.*"  In view of these solemn declarations by Congress, together with the pleadings and other considerations mentioned, it is manifest that the 100th meridian of longitude named in the act of 1850 is that laid down by Melish.

But if the intersection of the 100th meridian of longitude with the parallel 36° 30' north latitude, constituting the beginning of the north boundary line of Texas under the act of 1850,.

shall be held to mean the actual, and not the Melish intersection, it does not follow that the actual, and not the Melish 100th meridian constitutes the eastern boundary line of the State. Before this court can reach the conclusion contended for by complainants, it must set at naught the pleadings in the cause, the repeated declarations of the sovereign power of the United States, and the obvious meaning of the act of purchase. Nor is the situation altered by the fact that this construction will leave for future determination the ownership of a portion of the northeastern territory. That has occurred before. *Cook* v. *United States*, 138 U. S. 157. It should not be used as a pretext to disturb the integrity of our territory. The small consideration of ten millions of dollars, paid under the act of 1850, in itself refutes such a contention; and the United States, now grown imperial in every national aspect, should limit rather than enlarge the terms of contracts with members of the Union.

Counsel for the United States does not appear to contest the proposition that the map of Melish constitutes part of the treaty, and that its representation of degrees of latitude and longitude is controlling unless affected by the act of 1850. The rule is thoroughly settled. *McIver* v. *Walker*, 9 Cranch, 173; *McIver* v. *Walker*, 4 Wheat. 444; *Noonan* v. *Lee*, 2 Black, 499; *Davis* v. *Rainesford*, 17 Mass. 207; *Jenkins* v. *Trager*, 40 Fed. Rep. 726; *Koenigham* v. *Miles*, 67 Texas, 113; *Cragin* v. *Powell*, 128 U. S. 691; *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178.

If there were otherwise doubt of the matter, the fact that the treaty expressly provides for determining the *actual* source of the Arkansas River, regardless of the map, establishes beyond question that the purpose was to leave all else to the delineation of the map. While this rule is practically admitted, it seems to be insisted by counsel that the Melish delineation of upper Red River is inaccurate, that the North and South Forks of that river, as now known, are not represented upon that map, and that the United States had no other knowledge of the country other than that afforded by the Melish map. Recalling the admission heretofore referred

to, that according to that map Greer County is in Texas, it is not material, if true, that the forks are not represented, or that the map is not accurate, or that the United States were without other information, and a decree should be entered for the defendant regardless of these matters. For reasons to be stated, it is certain, however, that both of the forks of the river are laid down on the Melish map of 1818, that their existence was fully known to the United States and Spain at the date of the treaty, and that the map is surprisingly accurate.

Before discussing these propositions, however, we call attention to the strong testimony to the effect that the South Fork, or Prairie Dog Town River, is not laid down on the Melish map, that the treaty was entered into without reference to it, and consequently the North Fork is the river of the treaty. Especially we invite attention to the testimony in the record of Mr. Charles W. Pressler, at present and for 38 years engaged as chief and assistant draughtsman in the General Land Office of Texas, and the most experienced and competent map maker in the State.

The testimony demonstrates that the North and South Forks of Red River are laid down on the Melish map of 1818 and made part of the treaty, the confluence being just west of the 101st meridian of longitude, between the 33d and 34th parallels of latitude. By the scale of this map the confluence is about 70 miles west of the intersection of the 100th meridian with Red River, and therefore the territory in controversy belongs to Texas. The propositions which we now purpose establishing are that the parties to the treaty were well informed of the geographical features of the country in the vicinity of the forks of Red River; in reference to these features they agreed upon the 100th meridian of west longitude, as laid down on the map of Melish, as the boundary line from Red River to the Arkansas, whether astronomically correct or not.; that said boundary line was thus fixed by the map and with reference to the great natural landmarks shown on the face of the map; that its position so fixed is far east of the forks of Red River and of Greer County, and of the line now claimed by

complainants to be the true 100th meridian; and that the map of Melish delineates the North and South Forks of Red River and is substantially accurate. The position assumed by complainants, that the section of country in dispute was unknown to them and to the Spaniards, is thoroughly disproved by the record. It will be shown that it was known to the Spanish government and the United States in this order. The negotiations between the parties leading up to the treaty show that the territory which had been under discussion at the time of the treaty, was bounded on the south by a line along Red River, from the vicinity of Natchitoches to its head, and thence west to the Pacific Ocean, and on the north by a line from the mouth of the Missouri River westward to the Pacific Ocean, along the courses of the Missouri and Columbia rivers; but that towards the close of the discussion, it was narrowed principally to the region between the Red River, west of Natchitoches and the Arkansas.

The question of boundary had existed from the acquisition of Louisiana by the United States in 1803, and both parties to the treaty had, for many years, been informing themselves of this extensive region and its geographical outline.

The record shows that it was known to the Spaniards as early as 1541, when Coronado made a military expedition from the mouth of the Puerco or Pecos River, reaching the region of the Arkansas, Kansas and Platte Rivers, occupied by the Quivera Indians, subsequently, in 1778, called the Pawnees or Pananas by the Spaniards.

It was visited and occupied by them continually from that time until the date of the treaty, from Santa Fé as a base of operations, as shown by the record.

[Counsel then referred in detail to Spanish expeditions in 1601, 1611, 1629, 1632, 1650, 1654, 1698; and to French expeditions in 1698, 1719, 1722, 1724, 1727, 1729 and 1759.]

But there still remains to be mentioned perhaps the most conclusive evidence of the familiar knowledge the Spanish government had of the region under discussion.

On the face of the country, from the northeastern borders of Texas along the Red River to the head of the North Fork

of Red River, there are still to be seen traces of Spanish civilization and enterprise, which show the occupancy of all that river, including the North Fork to its source, by the Spaniards, from ancient times to dates within the memory of men now living, while no similar or other signs of such occupancy by them have been discovered on the South Fork of that river.

About the year 1791 the Spanish government laid out two roads eastward from Santa Fé; one to a point in the Province of Louisiana known as the Establishment of San Louis of the Illinois, which was an eastern tributary of the Arkansas River, debouching into it nearly opposite the mouth of the Canadian, a western tributary of the same river; and the other to Natchitoches on Red River, in the Province of Louisiana.

These roads were by way of the North Fork of Red River, and the Kiowa and Panis villages on that stream; the former about 75 miles and the latter about 35 miles above its junction with the Prairie Dog Town River, or South Fork of Red River, and passing down the North Fork, in places for some miles having two tracks, by reason of cut-offs, reached the junction of the North and South Forks of Red River on the east side of the North Fork, and there separated, one going toward the Illinois River, which lies a short distance west of Fort Smith, Arkansas, and the other crossing the river below said junction to the south side, and passing down that side of the river towards Natchitoches, dividing into several tracks in places, by reason of cut-offs; and the stream down which these roads passed was the stream known as the Rio Roxo de Natchitoches, the boundary line of the treaty of 1819, south and west of which is the territory of Greer County.

That the two roads were laid out from Santa Fé, the capital of the province of New Mexico, to the points mentioned above, is shown by the public archives of the territory of New Mexico.

The points to which they were laid out, the Illinois River and Natchitoches, are both delineated on Pike's map accompanying his published account of his expedition up the Arkansas River, put in evidence by complainants. That of the Illinois, as shown by several modern maps in the record, appears to be

a little over one half of a degree west of Fort Smith, Arkansas; while that of Natchitoches appears to be on the Red River, in the State of Louisiana. Mésières describes these two localities as being about the same distance from the Taovayase villages as San Antonio and Santa Fé.

The following facts in the record show that these roads were laid out and became well travelled roads, to and from the North Fork of Red River.

There remains an old, well worn and beaten road, long since fallen into disuse, but still visible and well marked on the face of the ground, from the northeast corner of Texas up the south side of Red River, by way of an old Spanish fort in Montague County on Red River, to a neighborhood above the mouth of the Wichita River, and thence across the Red River northward to the forks of the river, on the east side of the North Fork of Red River; thence up the same to the site of the old Panis villages, and to the site above occupied by the Kiowa Indians in 1833, about 75 miles above the forks of Red River; and thence by way of the head of the False Wichita River toward Santa Fé, in places dividing into two roads where there are bends in the river, which road, as far back as the memory of very old men reaches, has been known and reputed, in the neighborhood through which it passes, as the old Santa Fé road from Natchitoches; and as late as 1819 was frequented by Mexican traders coming from Santa Fé, and as late as 1838 or 1839 was used by a party of Chihuahua traders coming from Santa Fé; while as late as 1833 there existed an old, well worn, but disused, wagon road from the forks of Red River eastward to the region of the Illinois River, near Fort Smith, Arkansas, which was travelled by a large party of men from Fort Smith to the forks of Red River in 1833, where it intersected the other old road from Natchitoches to Santa Fé.

The ruins of a number of old Spanish villages and fortifications still exist along the route of the old Natchitoches and Santa Fé road, on the North Fork of Red River, and on this river below its junction with the Prairie Dog Town River, which conclusively demonstrates our proposition of familiar

knowledge with the North Fork, and shows the reason for the old road, and why the North Fork was deemed and named the Red River of Natchitoches, while the absence of any such evidence of occupancy and familiar knowledge of the Prairie Dog Town River country equally demonstrates the improbability that it was ever deemed the Rio Roxo of Natchitoches prior to the treaty of 1819.

In 1762, by the treaty of Fontainebleau, the territory of Louisiana was transferred by France to Spain. That this region was, at the time of that treaty, well known to the Spaniards counsel claimed was shown by an abundance of evidence in the record, which they referred to in detail.

The same region was well known to the government of the United States, at the date of the treaty, especially along its northern border, and along the Arkansas River, and at the point of intersection of that river by the 100th meridian, as laid down on Melish's map.

In 1803, the United States having arranged for the acquisition of Louisiana, both Upper and Lower, sent out Messrs. Lewis and Clark to explore the country between the mouth of the Missouri and the Pacific Ocean. These men performed this task with such wonderful fidelity, that their fame has to this day reached the ear of every schoolboy in the land; and their reports show that at that time the whole region between the Arkansas and Missouri rivers was occupied by American, English, and French traders.

They were particularly instructed by President Jefferson in these words, to wit: "Although your route will be along the Missouri, yet you will endeavor to inform yourselves by inquiry of the character and extent of the country watered by its branches, and especially on its south side. The North River, or Rio Bravo, which runs into the Gulf of Mexico, and the North River, or Colorado, which runs into the Gulf of California, are understood to be the principal streams heading opposite the headwaters of the Missouri, and running southwardly. Whether the dividing grounds between the Missouri and them are mountainous or flat lands, what are their distances from the Missouri, the character of the intermediate

country, and the people inhabiting it, are worthy of particular attention."

They met and had dealings and intercourse with divers traders from St. Louis, who traded up the Osage, Platte, and Kansas Rivers, and reported minutely the character of the country and its population, even extending to the Pawnees on Red River.

The statistical table prepared by them, to which the attention of the United States Congress was called by President Jefferson in his special message, in 1808, shows a minute knowledge of the localities occupied by the Indians from the mouth of the Canadian to the head of the Arkansas, Platte, and Kansas Rivers, as well as minute statistics of their numbers, character, habits, associations, commerce, the people with whom they traded or were at war, and their condition generally. Counsel also called attention to Zebulon Pike's expedition in 1806; to Sibley's account in the same year, and to the two maps published with the account of Pike's expedition in 1810, concerning which they said: On their face it conspicuously appears that the United States, by Officers Wilkerson and Pike, had made careful and precise reconnoissance of all the region along the Arkansas River, from its mouth to its source, and especially about the apex of the great bend of the Arkansas, at which Wilkerson and Pike had camped and separated, one to explore the river to its mouth, and the other to explore it to its source; and at which the boundary line of the treaty, the 100th meridian of Melish's map, intersected the river.

It is clear, therefore, that the United States government, before the date of the treaty, had at command abundant means of knowledge of the whole country from the junction of the Verdigris, Canadian and Illinois Rivers with the Arkansas, described by Lieutenant Wilkerson, to the head of the latter, and from the mouth of Red River to the home of the Panis on the North Fork of the Red River which was utilized till the date of the treaty.

In 1818 John Melish published in the city of Philadelphia the map which was made the map of the treaty of 1819. Looking at it, and along the 100th meridian of west longitude,

between the Red River and the Arkansas River, we are struck with the aptness of the language of the treaty that it was intended to designate with precision the limits of the respective bordering territories ; for on both sides of that line we see delineated great natural landmarks which, if they exist on the ground, must necessarily fix and determine its locality with remarkable precision.

The parties to the treaty were both definitely notified by this map that the Red River forked west of that line, at a point nearly due south, but a little east of south, and about 207 miles by the scale of the map from the apex of the Great South Bend of the Arkansas River, and south of a mountainous region that extended along the North Fork on its north side toward the northwest, and then northward to the Arkansas River ; and that to the northeast of that. South Bend of the Arkansas River, and in close proximity to the 100th meridian limit, lay the apex of a Great North Bend of the same river ; while close by, but on the opposite side of that meridian, was the notable point where Pike had commenced his explorations of that river, under the auspices of the United States government, in 1806, and that from the apex of that North Bend the river took its course in a long stretch to the south-east, till it reached the neighborhood of several contiguous and peculiarly shaped bends, about the mouth of Jefferson River, in a region northeast from the forks of Red River, and southeast from the South Bend of the Arkansas. And especially were they notified by this map that both of the forks or branches of Red River, and all of their headwaters, lay west of that line agreed upon as a boundary from the Red River to the Arkansas.

It is obvious from the record, that these several great natural features and outlines exist on the ground in the corresponding relative position to each other and to Melish's 100th meridian delineated on this map, and that the information by which these striking correlations were delineated must have been remarkably accurate for that day and time ; and that the allegation of plaintiff, that in fact Melish had no knowledge of the existence of said forks of Red River, is untrue and reckless.

The forks of Red River are found in the relative position delineated.

The record shows that those forks have been found by careful astronomical observation to be about 227 miles south and 36 miles east of the apex of the Great South Bend of the Arkansas. It shows that the mountainous country north of the forks and north of the North Fork, and extending northward towards the Arkansas River, exists on the ground. It shows that the apex of a Great North Bend of that river, to the northeast of the apex of the South Bend, exists on the ground, in close proximity to the point where Pike commenced his exploration of the river in 1806. It shows that the long stretch of the Arkansas River southeast from the apex of the Great North Bend to the several contiguous and peculiar bends of the river about the mouth of the Salt Fork of modern maps, which is the Jefferson's River of Melish's map, exist on the ground. It shows that these peculiar bends of the river lie southeast from the apex of its Great South Bend, and northeast of the forks of Red River. It shows that these several great landmarks, as they exist on the ground, lie approximately in the same relative position to the line delineated by Melish for the 100th meridian of west longitude, as they are represented to be on the map, and especially that the forks of Red River are west of that line; and that all of the headwaters of both the North and South Forks, and also the mountains along the North Fork, lie west of that line, as they exist on the ground. And the conclusion is inevitable that the boundary line of the treaty, from Red River to the Arkansas along the meridian of the 100th degree west longitude, as laid down on Melish's map, lies east of the forks of Red River, and intersects the Arkansas River in the immediate vicinity and west of the apex of the Great North Bend of that stream, and also intersects the Red River at a point far below and east of the forks of that river, and lies far to the eastward of Greer County, and that this fact must have been fully understood and acted upon by both parties to the treaty since they made the 100th meridian, as laid down on this map, the boundary.

The parties to the treaty were well advised of the difficulty

and uncertainty of determining with precision and accuracy
the position of meridian lines at that day and time.  They
were fully informed that Pike, with the use of the astronomi-
cal instruments and appliances with which he was provided,
had laid down the 100th meridian of west longitude in refer-
ence to the Great North Bend of the Arkansas, about two
degrees farther east than Melish had done, with the assistance
of the recent surveys of Bringier.

The telegraph was then unknown, and the methods then in
use of ascertaining the differences in time between Greenwich
or Washington and the locality of the observer had proved
too crude to be relied upon to fix with precision a boundary
line ; of which fact the parties to the treaty had a demonstra-
tion in the two maps just mentioned.

Hence the necessity of agreeing upon a diagram laying
down the line of boundary in reference to great and stable
natural landmarks upon a map, which should point out the
unchanging and unchangeable localities had in view, to fix
the position of the line.

Had the treaty been in 1806, and the absolute 100th merid-
ian been made the boundary, and Pike been called on to
mark it on the ground, he would have located it nearly two
degrees east of the apex of the Great North Bend of the
Arkansas River.  (See his map.)  But if the parties had sur-
veyed the ground and made observations twelve years later
with Bringier, whose data were adopted by Melish, the line
would have appeared to be two degrees farther west, where
Melish laid it down ; and had the survey been postponed till
forty years more had elapsed, Jones and Brown would have
made the line appear more than fifty miles still farther to the
westward, and west of the apex of the Great South Bend of
the Arkansas River, and at least three degrees farther west
than its determination by Pike in the year 1806.

To suppose the treaty-makers intended a line whose position
might be shifted with every improvement in methods and in-
struments used in making astronomical observations, when
expressly declaring that it should be as laid down on the map
of the treaty, in the midst of great and unmistakable natural

land marks, is too unreasonable for discussion. It is worthy of remark, that after the treaty of boundary, Melish furnished his map to the historian Bonnycastle, and the latter published it in his New Spain as Melish's map in 1819, and that on its face the line of demarcation between the territories of Spain and the United States, indicated by a dotted line, is laid down as intersecting the Arkansas River at the Great Bend of that river (see Bonnycastle's New Spain); and that George Catlin's map of Indian Localities in 1833 still laid down the same boundary as intersecting· that river at the same bend, where Melish laid down the 100th meridian, and corresponds to the line established as the boundary by Exhibit B. of C. Corner and his testimony.

II. If the treaty and map of Melish be disregarded, considered scientifically and historically, the North Fork is the main Red River, and consequently the territory is rightfully part of Texas.

Scientifically the North Fork is the main river, because it is the permanent and longest stream, discharges annually the greater volume of water, and imposes its course upon the river at and below the confluence; and historically it is the main river, because it was first discovered and was named and known as Red River, while the South Fork was named Prairie Dog Town River.

Without regard to the comparative length and breadth of their beds, however, the North Fork is shown to be the principal river in reference to the most important attributes of a river, to wit, the quantity of water which it furnishes, and its permanency as a flowing stream, and for that reason it was and is the stream properly considered the Red River of Natchitoches; and if the 100th meridian of west longitude, as laid down on Melish's map, and designated in the treaty of boundary as the boundary line, lies as far west as the forks of Red River, then the North Fork should be deemed the boundary line, and the territory to the south of it, including Greer County, should be held to be Texas territory.

After examining in detail a mass of testimony, which, they contended, established these propositions, counsel said : If it

be conceded, against the overwhelming testimony in the case, that the South Fork discharges the greater volume of water, the North Fork is yet the river of the treaty and the main Rio Roxo of Natchitoches, because of its first discovery and historical designation as such, upon which there is no conflict in the testimony. It is well known that the Missouri is the real continuation of the Mississippi River, but it is no more competent to reverse history there, upon principles of justice and national honor, than to disrupt conditions which have existed on Red River for three quarters of a century.

III. Since its independence, Texas has likewise asserted its ownership of said territory, and has persisted in such assertion down to the present day by acts of government, of legislation and of occupancy. No governmental act of the State can be tortured or perverted into acquiescence on its part in the claim of the United States. To the contrary the government of the United States has recognized the right of Texas to the territory in dispute by solemn acts of government, and is now estopped to claim the same or any part thereof.

One of the earliest acts of the Republic of Texas was the assertion of its boundary rights under the treaty of 1819 by virtue of an act of Congress of the Republic of Texas approved December 19, 1836, the first section of which read as follows:

Section 1. "That the civil and political jurisdiction of this Republic be and is hereby declared to extend to the following boundaries, to wit: Beginning at the mouth of the Sabine River and running west along the gulf of Mexico three leagues from land to the mouth of the Rio Grande; thence up the principal stream of said river to its sources; thence due north to the 42d degree of north latitude; thence along the boundary line as defined in the treaty between the United States and Spain, to the beginning." 1 Paschal's Dig. of Laws, Art. 438.

After its admission as a State, by joint resolution adopted April 29, 1846, Texas asserted its exclusive right to its soil and boundaries in the following words:

Section 1. "That the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of

Texas was acquired by the valor of the people thereof, and was by them vested in the government of the said Republic; that such exclusive right is now vested in and belongs to the State, excepting such jurisdiction as is vested in the United States by the Constitution of the United States and by the general resolution of annexation subject to such regulations and control as the government thereof may deem expedient to adopt; that we recognize no title in the Indian tribes resident within the limits of the State to any portion of the soil thereof, and that we recognize no right in the government of the United States to make any treaty of limits with the said Indian tribes without the consent of the government of this State." 1 Paschal's Dig. of Laws, Art. 441.

It continued to assert its jurisdiction over the territory in dispute by legislation beginning in 1839, and extending through all the intervening years.

In addition to this, Texas has donated to Greer County, outside of the limits of Greer County, 17,712 acres (four leagues) for county school purposes. It has erected sixty public school buildings in the county. In 1892 there were 2250 enrolled scholars in the public schools. In 1892, by the last school apportionment, Texas was distributing annually $11,844 of taxes collected from the people of Texas, among the inhabitants of Greer County for the purpose of public education on the basis of $5.26⅔ per pupil. It had established sixty-six district schools besides school communities, and sometimes they organized two or more institutions in a community for school purposes. Every school district had a school except two, in which they had exhausted their school money in erecting school buildings.

These facts briefly cited from the record, (and there is a vast accumulation of other evidence therein; but to which the attention of the court is directed,) manifest most clearly that Texas has been in the actual possession of the particular territory claimed by the United States in this suit, for a period of more than fifty years, claiming expressly under the treaty of 1819, as Mexico, its predecessor, had claimed before, and as had been claimed by Spain prior to the independence of

Mexico, from the date of the treaty until the termination of her dominion.

The record further abundantly attests, some of the evidence as to which has been cited already by us, that the United States by solemn acts of Congress had recognized this possession of Texas and had ripened it into a confirmed right, long anterior to the commencement of these proceedings.

In *Phillips* v. *Payne*, 92 U. S. 130, where an effort was made to avoid payment of taxes because of the alleged unlawful retrocession of Alexandria to Virginia, the court held that the party was estopped from questioning that.

Greer County is fixed, and has been since its organization in 1860, in a senatorial district and in a legislative district, one of the legislative districts of Texas, and has been constantly represented. It has been, and is, in a judicial district of the United States by act of Congress. It has been, and is, in a Congressional district. All that time it has had its position in a state judicial district. Not till about seven years ago did the Post Office Department cease to fix post offices in Greer county, Texas, which it had done regularly before then. At that time it, for some reason, changed the description, but it was too late for any purpose touching the rights of Texas to this property.

All this and much more that could be added, if need be, show that Greer County, Texas, has been recognized by people, private and public officials, both state and national, and by both state and national authorities, legislative, executive and judicial. Not more firmly fixed in their respective statehoods is Cook County in Illinois, or Bourbon County in Kentucky, or Bucks County in Pennsylvania.

Nations are prescribed and estopped as individuals, so are we told in *Phillips* v. *Payne*, *sup.* In this discussion we stand alone upon acts open and undisguised, and say nothing upon propositions to settle or to compromise, after it was thought by some that the line should be away below where it is, as all such efforts are for peace and quiet, and the law commends them and does not draw any admission from them.

The facts disclose two real acts of estoppel against the United States, substantial in their character.

(1.) The reimbursement of Texas for the disarmament of Snively's command was recommended by the President to Congress, and Congress in pursuance of such recommendation, promptly provided compensation. If Snively's command was not upon United States territory at the time of its disarmament by Captain Cooke, the Texans were there wrongfully and ought to have been disarmed, and their arms confiscated. There could be no claim for indemnity on the part of Texas for a wrongful act such as this. If it invaded the territory of a neighboring Republic in 1843 its troops should have been captured and their arms and supplies should have been confiscated; because for all intents and purposes they were acting as public enemies and by the law of nations were entitled to no grace. Yet, as is admitted, in 1847, the government of the United States made public reparation for the wrong done, practically confessing the wrong, and in effect declaring by the legislation, that the Texas troops were rightfully upon Texas territory at the time they were captured and their arms seized by Captain Cooke. This territory comprises the territory of Greer County, now in dispute, and it is too late now for the government to contend for a different finding.

(2.) A governmental act of more potent significance is in the legislation by Congress of 1879 creating the Northern Judicial District of Texas. The force and effect of this legislation is attempted to be parried by complainant in this cause by the insertion of long extracts from the reports of House Committees and statements by Chairmen of House Committees that this legislation was inadvertent and had and done in ignorance by the members of the Congress and Senators as to the true status of the territory embraced within such legislation. The counsel for the government seems to misapprehend or to defiantly disregard the force and potency of his own suggestion. Notwithstanding these reports of committees and *ex cathedra* utterances of chairmen of committees, this statute of Congress so disposing of Greer County, Texas, as a part of the territory of Texas, has been upon the statute

book for fifteen years unrepealed, unqualified, and unaffected. Can this court disregard such legislation? Can this court, with all its powers, afford to say, and especially upon the faint intimations of the record, that Congress did wrong, either from ignorance or any other motive? Not so. The record is made up, and this court and every State in the Union and every citizen of every State, and the United States itself, must abide by the record as made. Greer County is a part of Texas, so conceded by the government of the United States, which stands in law estopped by such governmental act.

IV. Should the court determine all questions submitted against the State of Texas, including that of estoppel, there certainly can be no doubt of the right of defendant to insist that the intersection of the 100th meridian with the river be accurately fixed. This has been done by Professor H. S. Pritchett against whose conclusion not a syllable of testimony has been adduced, and the line should be established as found by him, 3797.3 feet east of the initial monument placed by Messrs. Jones and Brown in 1858.

MR. JUSTICE HARLAN delivered the opinion of the court.

By the act of Congress of May 2, 1890, c. 182, establishing a temporary government for the Territory of Oklahoma, and enlarging the jurisdiction of the United States court in the Indian Territory, it was declared that that act should not apply to "Greer County" until the title to the same had been adjudicated and determined to be in the United States. And that there might be a speedy judicial determination of that question the Attorney General of the United States was directed to institute in this court a suit in equity against the State of Texas, setting forth the title and claim of the United States "to the tract of land lying between the North and South Forks of the Red River where the Indian Territory and the State of Texas adjoin, east of the one hundredth degree of longitude, and claimed by the State of Texas as within its boundary and a part of its land, and designated on

its map as Greer County;" the court, on the trial of the case, in its discretion, and so far as the ends of justice would warrant, to consider any evidence taken and received by the Joint Boundary Commission under the act of Congress, approved January 31, 1885.  26 Stat. 81, 92, § 25.

In order that the precise locality of this land may be indicated, and for convenience, we insert on page 22 an extract from a map of Texas and of the Indian Territory, published in 1892.  The territory in dispute is marked on that map with the words "Unassigned Land."  It contains about 1,511,576.17 acres, lies east of the 100th meridian of longitude and west and south of the river marked on that map as the North Fork of Red River and with the words "Boundary claimed by the State of Texas."  It is north of the line marked on that map with the words "Boundary claimed by U. S."  The river on the south side is now commonly known as Prairie Dog Town Fork of Red River, (the Indian name of which is Kecheahquehono,) which has its source in the western part of Texas, and is the same river as the South Fork of Red River mentioned in the act of 1890.

The present suit was instituted pursuant to that act. · The State appeared, and demurred to the bill upon the following grounds : 1.  The question of boundary raised by the suit was political in its character, and not susceptible of judicial determination by this court in the exercise of any jurisdiction conferred by the Constitution and laws of the United States. 2. Under the Constitution it was not competent for the United States to sue, in its own courts, one of the States composing the Union.  3. This court, sitting as a court of equity, could not hear and determine the present controversy — the right asserted by the United States being in its nature legal and not equitable.

Upon full consideration these several grounds of demurrer were overruled. ·*United States* v. *Texas*, 143 U. S. 621.  The reasons given for that conclusion need not be here repeated.

The State answered the bill, controverting the claim of the United States and asserting that the lands within the boundary mentioned in the above act constitute a part of its terri-

Opinion of the Court.

No. 1. Map of 1892.

tory.   The United States filed a replication, and proofs. having been taken, the case is now before the court upon its merits.

Both parties assert title under certain articles of the treaty between the United States and Spain, made February 22, 1819, and ratified February 19, 1821.   8 Stat. 252, 254, 256.

Before examining those articles, it will be useful to refer to the diplomatic correspondence that preceded the making of the treaty.   That correspondence commenced during the administration of President Madison, and was concluded under that of President Monroe.   It appears that the nego-tiations upon the subject of the boundaries between the respective possessions of the two countries was more than once suspended because certain demands on the part of Spain were regarded by the United States as wholly inadmissible, 4 American State Papers, Foreign Relations, pp. 425, 430, 438, 439, 452, 464, 465, 466, 478.   Finally, on the 24th day of October, 1818, the Spanish minister, "to avoid all cause of dispute in future," proposed to Mr. Adams, Secretary of State, that the limits of the possessions of the two governments west of the Mississippi should be designated by a line beginning "on the Gulf of Mexico, between the rivers Mermento and Calcasia, following the Arroyo Hondo, between the Adaes and Natchitoches, crossing the Rio or Red River at the thirty-second degree of latitude, and ninety-third of longitude from London, according to Melish's map, and thence running directly north, crossing the Arkansas, the White and the Osage Rivers, till it strikes the Missouri, and then following the middle of that river to its source, so that the territory on the right bank of the said river will belong to Spain, and that on the left bank to the United States.   The navigation, as well of the Missouri as of the Mississippi and Mermento, shall remain free to the subjects of both parties."   He also proposed that, in order "to fix this line with more precision, and to place the landmarks which shall designate exactly the limits of both nations," each of the contracting parties should appoint a commissioner and surveyor, who should run and mark the line, and make out plans and keep journals of

their proceedings, the result agreed upon by them to be considered part of the treaty, and have the same effect as if inserted in it. Annals of Congress, 15th Cong. 2d Sess. 1819, 1890, 1900.

To this proposition Mr. Adams, under date of October 31, 1818, replied : " Instead of it, I am authorized to propose to you the following, and to assure you that it is to be considered as the final offer on the part of the United States : Beginning at the mouth of the river Sabine, on the Gulf of Mexico, following the course of said river to the thirty-second degree of latitude; the eastern bank and all the islands in the said river to belong to the United States, and the western bank to Spain; thence, due north, to the northernmost part of the thirty-third degree of north latitude, and until it strikes the Rio Roxo, or Red River; thence, following the course of the said river, *to its source, touching the chain of the Snow Mountains* in latitude 37° 25' north, longitude 106° 15' west, or thereabouts, as marked on Melish's map; thence to the summit of the said mountains, and following the chain of the same to the forty-first parallel of latitude ; thence, following the said parallel of latitude, 41°, to the South Sea. The northern bank of the said Red River, and all the islands therein, to belong to the United States, and the southern bank of the same to Spain." " It is believed," Mr. Adams said, " that this line will render the appointment of commissioners for fixing it more precisely unnecessary, unless it be for the purpose of ascertaining the spot where the river Sabine falls upon latitude 32° north, and the line thence due north to the Red River, and the point of latitude 41° north on the ridge of the Snow Mountains." Annals of Congress, 15th Cong. 2d Sess. 1903, 1904.

This proposition was rejected by the Spanish minister, and in his letter of November 16, 1818, he said : " I will undertake to admit the river Sabine instead of the Mermento as the boundary between the two powers, from the Gulf of Mexico, on condition that the same line proposed by you shall run due north from the point where it crosses the river Roxo (Red River) until it strikes the Mississippi, and extend thence along

the middle of the latter to its source, leaving to. Spain the territory lying to the right, and to the United States the territory lying to the left of the same." To this Mr. Adams replied under date of November 30, 1818 : ": As you have now declared that you are not authorized to agree, either to the course of the Red River (Rio Roxo) for the boundary, or to the forty-first parallel of latitude, from the Snow Mountains to the Pacific Ocean, the President deems it useless to pursue any further the attempt at an adjustment of this object by the present negotiation. I am therefore directed to state to you that the offer of a line for the western boundary, made to you in my last letter, is no longer obligatory upon this government. Reserving, then, all the rights of the United States to the ancient western boundary of the colony of Louisiana by the course of the Rio Bravo del Norte, I am," etc. Annals of Congress, 15th Cong. 2d Sess. 1908, 1942.

The negotiations were resumed in the succeeding year and the Spanish minister wrote to Mr. Adams, under date of February 1, 1819 : "Having thus declared to you my readiness to meet the views of the United States in the essential point of their demand, I have to state to you that His Majesty is unable to agree to the admission of the Red River *to its source,* as proposed by you. *This river rises within a few leagues of Sante Fé,* the capital of New Mexico, and as I flatter myself the United States have no hostile intentions towards Spain, at the moment we are using all our efforts to strengthen the existing friendship between the two nations, it must be indifferent to them to accept the Arkansas instead of the Red River as the boundary. This opinion is strengthened by the well known fact, that the intermediate space between these two rivers is so much impregnated with nitre as scarcely to be susceptible of improvement. In consideration of these obvious reasons, I propose to you, that, drawing the boundary line from the Gulf of Mexico, by the river Sabine, as laid down by you, it shall follow the course of that river to its source ; thence, by the ninety-fourth degree of longitude, to the Red River of Natchitoches, and along the same to the ninety-fifth degree, and crossing it at that point, to run by a line due north to the Ar-

kansas, and along it to its source; thence, by a line due west till it strikes the source of the river San Clemente, or Multnomah, in latitude 41°, and along that river to the Pacific Ocean; the whole agreeably to Melish's map." Annals of Congress, 15th Cong. 2d Sess. 2111, 2112.

The last proposition made by Mr. Adams to the Spanish minister contained the following : " Art. 3. The boundary line between the two countries, west of the Mississippi, shall begin on the Gulf of Mexico, at the mouth of the river Sabine in the sea; continuing north, along the western bank of that river, to the thirty-second degree of latitude; thence by a line due north to the degree of latitude where it strikes the Rio Roxo of Natchitoches, or Red River; thence following the course of the Rio Roxo westward, to the degree of longitude one hundred and two degrees west from London and twenty-five degrees from Washington; then, crossing the said Red River, and running thence, by a line due north, to the river Arkansas; thence following the course of the southern bank of the Arkansas, to its source in latitude forty-one degrees north; and thence, by the parallel of latitude, to the South Sea; the whole being as laid down in Melish's map of the United States, published in Philadelphia, improved to the 1st of January, 1818. But, if the source of the Arkansas River should be found to fall north or south of latitude forty-one degrees, then the line shall run from the said source due south or north, as the case may be, till it meets the said parallel of latitude forty-one degrees, and thence along the said parallel to the South Sea; the Sabine and the said Red and Arkansas Rivers, and all the islands in the same, throughout the course thus described, to belong to the United States, and the western bank of the Sabine, and the southern banks of the said Red and Arkansas Rivers throughout the line thus described to belong to Spain. And the United States hereby cede to His Catholic Majesty all their rights, claims and pretensions to the territories lying west and south of the above described line; and His Catholic Majesty cedes to the said United States all his rights, claims and pretensions to any territories east and north of said line, and, for himself, his heirs and successors, renounces

all claims to said territories forever." The Spanish minister required that " the boundary between the two countries shall be the middle of the rivers, and that the navigation of the said rivers shall be common to both countries." Mr. Adams replied that the United States had always intended that "the property of the river should belong to them," and he insisted on that point " as an essential condition, as the means of avoiding all collision, and as a principle adopted henceforth by the United States in its treaties with its neighbors." He agreed, however, " that the navigation of the said rivers to the sea shall be common to both people." The Spanish minister assented " to the 100th degree of longitude and to remove all difficulties, to admit the 42d instead of the 43d degree of latitude from the Arkansas to the Pacific Ocean." Annals of Congress, Appendix, 15th Cong. 2d Sess. 2120, 2121, 2123.

We have alluded to this diplomatic correspondence to show the circumstances under which the treaty of 1819 was made, and to bring out distinctly two facts that are of some importance in the present discussion : 1. That the negotiators had access to the map of Melish, improved to 1818 and published at Philadelphia. 2. That the river referred to in the correspondence as Red River was believed by the negotiators to have its source near Santa Fé and the Snow Mountains.

This brings us to the treaty itself. Its third and fourth articles are in these words:

"ART. 3. The boundary line between the two countries, west of the Mississippi, shall begin on the Gulf of Mexico, at the mouth of the river Sabine, in the sea, continuing north, along the western bank of that river to the 32d degree of latitude; thence, by a line due north, to the degree of latitude where it strikes the Rio Roxo of Natchitoches, or *Red River ;* *then following the course of the Rio Roxo, westward, to the degree of longitude* 100 *west from London and* 23 *from Washington ;* then, crossing the said Red River, and running thence, by a line due north, to the river Arkansas; thence, following the course of the southern bank of the Arkansas, to its source, in latitude 42 north; and thence by that parallel of latitude, to the South Sea. The whole being as laid down in Melish's

map of the United States, published at Philadelphia, improved to the first of January, 1818. But, if the source of the Arkansas River shall be found to fall north or south of latitude 42°, then the line shall run from the said source due south or north, as the case may be, till it meets the said parallel of latitude 42, and thence, along the said parallel, to the South Sea: All the islands in the Sabine, and the said Red and Arkansas Rivers, throughout the course thus described, to belong to the United States; but the use of the waters, and the navigation of the Sabine to the sea, and of the said rivers Roxo and Arkansas, throughout the extent of the said boundary, on their respective banks, shall be common to the respective inhabitants of both nations.

"The two high contracting parties agree to cede and renounce all their rights, claims, and pretensions, to the territories described by the said line; that is to say: the United States hereby cede to His Catholic Majesty, and renounce forever all their rights, claims and pretensions to the territories lying west and south of the above-described line; and, in like manner, His Catholic Majesty cedes to the said United States all his rights, claims and pretensions to any territories east and north of the said line; and for himself, his heirs, and successors, renounces all claim to the said territories forever.

"ART. 4. To fix this line with more precision, and to place the landmarks which shall designate exactly the limits of both nations, each of the contracting parties shall appoint a Commissioner and a Surveyor, who shall meet before the termination of one year, from the date of the ratification of this treaty, at Natchitoches, on the Red River, and proceed to run and mark the said line, from the mouth of the Sabine to the Red River, and from the Red River to the river Arkansas, and to ascertain the latitude of the source of the said river Arkansas, in conformity to what is above agreed upon and stipulated, and the line of latitude 42, to the South Sea: they shall make out plans, and keep journals of their proceedings, and the result agreed upon by them shall be considered as part of this treaty, and shall have the same force as if it were inserted therein. The two governments will amicably agree

respecting the necessary articles to be furnished to those persons, and also as to their respective escorts, should such be deemed necessary." 8 Stat. 252, 254, 256.

So much of the Melish map of 1818 as is necessary to show its bearing on the present inquiry is reproduced on pages 30 and 31.

It may be observed here that the 100th meridian of longitude is inaccurately located on this map. That meridian, astronomically located, is more than one hundred miles farther west than is indicated by the Melish map. This fact is clearly shown by the record, and is not seriously questioned.

By the treaty of 1828, between the United States of America and the United Mexican States, concluded January 12, 1828, the dividing limits of the respective countries were declared to be the same as those fixed by the treaty of 1819. 8 Stat. 372.

The Republic of Texas, by an act passed December 19, 1836, declared that the civil and political jurisdiction of that Republic extended to the following boundaries, to wit: "Beginning at the mouth of the Sabine River, and running west along the Gulf of Mexico three leagues from land to the mouth of the Rio Grande, thence up the principal stream of said river to its source, thence due north to the forty-second degree of north latitude, thence along the boundary line, as defined in the treaty between the United States and Spain, to the beginning; and that the President be, and is hereby, authorized and required to open a negotiation with the government of the United States of America, so soon as, in his opinion, the public interest requires it, to ascertain and define the boundary line as agreed upon in said treaty." 1 Sayles' Early Laws of Texas, Art. 257.

On the 25th of April, 1838, a convention was concluded between the United States and the Republic of Texas for marking the boundary referred to in the above treaty of 1828, as follows:

"Whereas the treaty of limits made and concluded on the twelfth day of January, in the year of our Lord one thousand, eight hundred and twenty-eight, between the United States of America of the one part and the United Mexican States of

Opinion of the Court.

### No. 2. Melish Map of 1818, Western Half.

Opinion of the Court.

### No. 2. Melish Map of 1818, Eastern Half.

the other, is binding upon the Republic of Texas, the same having been entered into at a time when Texas formed a part of the United Mexican States; And whereas it is deemed proper and expedient, in order to avoid future disputes and collisions between the United States and Texas in regard to the boundary between the two countries as designated by said treaty, that a portion of the same should be run and marked without unnecessary delay: The President of the United States has appointed John Forsyth their Plenipotentiary, and the President of the Republic of Texas has appointed Memucan Hunt its Plenipotentiary; and the said Plenipotentiaries having exchanged their full powers, have agreed upon and concluded the following articles: Article I. Each of the contracting parties shall appoint a commissioner and surveyor, who shall meet, before the termination of twelve months from the exchange of the ratifications of the convention, at New Orleans, and proceed to run and mark that portion of the said boundary which extends from the mouth of the Sabine, where that river enters the Gulf of Mexico, to the Red River. They shall make out plans and keep journals of their proceedings, and the result agreed upon by them shall be considered as part of this convention, and shall have the same force as if it were inserted therein. Article II. And it is agreed that until this line is marked out, as is provided for in the foregoing article, each of the contracting parties shall continue to exercise jurisdiction in all territory over which its jurisdiction has hitherto been exercised, and that the remaining portion of the said boundary line shall be run and marked at such time hereafter as may suit the convenience of both the contracting parties, until which time each of the said parties shall exercise, without the interference of the other within the territory of which the boundary shall not have been so marked and run, jurisdiction to the same extent to which it has been heretofore usually exercised." Treaties and Conventions, 1079, ed. 1889. By the act of Congress of January 11, 1839, c. 2, provision was made for carrying this convention into effect. 5 Stat. 312. It does not appear that anything of importance was accomplished under that act.

By a joint resolution passed March 1, 1845, Congress consented that " the territory properly included within and rightfully belonging to the Republic of Texas" might be erected into a State to be admitted into the Union, one of the conditions of such consent being that the new State be formed, subject to the adjustment by the United States of all questions of boundary that might arise with other governments.    5 Stat. 797.    The conditions prescribed were accepted by Texas.    1 Sayles' Early Laws of Texas, Art. 1531.    And by the joint resolution of Congress, approved December 29, 1845, Texas was admitted as one of the States of the Union, on an equal footing in all respects with the original States.    9 Stat. 108.

Then came the act of Congress, approved September 9, 1850, c. 49, 9 Stat. 446, entitled "An act proposing to the State of Texas the establishment of her northern and western boundaries, the relinquishment by the said State of all territory claimed by her exterior to said boundaries, and of all her claims upon the United States, and to establish a territorial government for New Mexico."    By that act certain propositions were made to the State of Texas, which, being accepted, were to be binding upon the United States and the State. Among them were the following :

" First.  The State of Texas will agree that her boundary *on the north* shall commence at the point *at which the meridian of one hundred degrees west from Greenwich* is intersected by the parallel of thirty-six degrees thirty minutes north latitude, and shall run from said point due west to the meridian of one hundred and three degrees west from Greenwich ; thence her boundary shall run due south to the thirty-second degree of north latitude ; thence on the said parallel of thirty-two degrees of north latitude to the Rio Bravo del Norte ; and thence with the channel of said river to the Gulf of Mexico.  Second.  The State of Texas cedes to the United States all her claim to territory exterior to the limits and boundaries which she *agrees to establish* by the first article of this agreement.  Third.  The State of Texas relinquishes all claim upon the United States for liability of the debts of Texas, and for compensation or indemnity for the surrender

to the United States of her ships, forts, arsenals, custom houses, custom-house revenues, arms and munitions of war, and public buildings, with their sites, which became the property of the United States at the time of the annexation. Fourth. The United States, in consideration of said establishment of boundaries, cession of claim to territory and relinquishment of claims; will pay to the State of Texas the sum of ten millions of dollars in a stock bearing five per cent interest, and redeemable at the end of fourteen years, the interest payable half-yearly at the treasury of the United States," and agreed to "be bound by the terms thereof, according to their import and meaning." 9 Stat. 446, 447.

The State accepted these propositions by an act, approved November 25, 1850, and agreed to " be bound by the terms thereof according to their import and meaning." 2 Sayles' Early Laws of Texas, Art. 2127.

In the light of these general facts, we recur to the treaty of 1819, from which it will be seen that the line agreed upon — starting from the point where the line due north from the Sabine River, at the 32d degree of latitude, strikes the Rio Roxo of Natchitoches or Red River — followed "the course of the Rio Roxo westward to the degree of longitude 100 west from London and 23 from Washington."

The contention of the United States is that this requirement cannot be met except by going westward along and up the Prairie Dog Town Fork of Red River to the point where (as shown on the first of the above maps) that river intersects the 100th meridian — the government claiming that that river, and not the North Fork of Red River, is a continuation or the principal fork of the Red River of the treaty.

The State insists that, even if the treaty be interpreted as referring to the true 100th meridian of longitude, and not to that meridian as located on the Melish map of 1818, " the course of the Rio Roxo westward" from the intersection of the line extending north from Sabine River to Red River, takes the line, not westwardly along the Prairie Dog Town Fork of Red River, but northwardly and northwestwardly up the North Fork of the Red River, (from its intersection

with Red River,) to the point where the latter fork crosses the true 100th meridian, between the thirty-fifth and thirty-sixth degrees of latitude.

But at the outset of the discussion the State propounds this proposition: That the treaty of 1819 having declared that the boundary lines between the United States and Spain should be as laid down on Melish's map of 1818, it is immaterial whether the location of the 100th meridian of longitude on that map was astronomically correct or not, or whether the one or the other fork of Red River was or is the continuation of the main river; that the map of Melish having fixed the 100th degree of longitude west from Greenwich below and east of the mouth of the North Fork of Red River, as now known, is conclusive upon both governments, their privies and successors. If this position be sound, the case is for the State; for it is conceded that the entire territory in dispute is *west* of the 100th meridian, *as that meridian appears on the Melish map of* 1818, although it is, beyond all question, east of the true 100th meridian, astronomically located and as long recognized both by the United States and Texas.

The State's answer thus presents this issue: "That the line of said 100th meridian of longitude west from London, as laid down on said map of Melish, intersects the Rio Roxo, or Red River, a distance of many miles east of what is claimed by the complainant to be the true line of said meridian, and many miles east of the point where the Kecheahquehono [Prairie Dog Town Fork of Red River] empties its waters into the Rio Roxo of the treaty; and said meridian so laid down on Melish's map and extended north to the 42d parallel of north latitude includes, *as territory properly belonging to and conceded to Spain* under the terms of the treaty, *and belonging of right to Texas* by virtue of the establishment of her independence, a large part of the lands *now belonging to the Chickasaw and other tribes of Indians, under concessions by treaty, as well as a portion of the present States of Kansas and of Colorado, and a part of the territory of New Mexico.* Defendant shows that long before and after the date of said treaty of 1819 the King of Spain claimed all this territory

lying west of said 100th meridian of longitude and south of said 42d parallel of latitude as laid down upon Melish's map; and in effectuation of such claim exercised repeated acts of ownership and dominion over the same without question; and after securing her independence and establishment as an independent nation, the United Mexican States likewise asserted their dominion and authority over said territory; and Texas, both as a separate Republic and as a State of the Union, has claimed and exercised complete ownership and dominion over said territory, including the territory now in controversy, by occupation of said territory by her armies, and by extending the operation of her laws over the same, and by various other acts and declarations, until the happening of the matters and things now here to be shown and set forth."

Referring to the pleadings and to the act of Congress of January 31, 1885, in which the terms of the treaty are recited, and which directs the commissioners appointed under it to "mark the point where the 100th meridian of longitude crosses Red River in accordance with the terms of the treaty," the counsel for the State says: "But if the intersection of the 100th meridian of longitude with the parallel 36° 30′ north latitude, constituting the beginning of the north boundary line of Texas under the act of 1850, 9 Stat. 446, c. 49, shall be held to mean the actual, and not the Melish, intersection, it does not follow that the actual and not the Melish 100th meridian constitutes the eastern boundary line of the State. . . . Nor is the situation altered by the fact that this construction will leave *for future determination* the ownership of a portion of the. northeastern territory."

If, as asserted by the State, this case should be determined upon the basis that the 100th meridian is where the Melish map located it, and not where it is in fact, this court may well decline to recognize a claim attended with such grave consequences as those suggested by the answer, unless it be clearly established.

Undoubtedly, the intention of the two governments, as gathered from the words of the treaty, must control; and the entire instrument must be examined in order that the real in-

tention of the contracting parties may be ascertained. 1 Kent Com. 174. For that purpose the map to which the contracting parties referred is to be given the same effect as if it had been expressly made a part of the treaty. *McIver's Lessee* v. *Walker*, 9 Cranch, 173; *McIver's Lessee* v. *Walker*, 4 Wheat. 444; *Noonan* v. *Lee*, 2 Black, 499; *Cragin* v. *Powell*, 128 U. S. 691, 696; *Jefferis* v. *Omaha Land Co.*, 134 U. S. 178, 194. But are we justified, upon any fair interpretation of the treaty, in assuming that the parties regarded that map as absolutely correct, in all respects, and not to be departed from in any particular or under any circumstances? Did the contracting parties intend that the words of the treaty should be literally followed, if by so doing the real object they had in mind would be defeated? The boundary line was to begin at the mouth of the river Sabine, and continue north along the western bank of that river to the 32d degree of latitude. Was it intended that the Melish map should control in fixing the point where the Sabine River met that degree of latitude? Was the line due north from Sabine River to Red River to begin at the intersection of Sabine River with the true 32d degree of latitude, or where Melish's map indicated the place of such intersection? The two governments certainly intended that the line should be run from the Gulf along the western bank of the Sabine River, and after it reached Red River that it should follow the course of that river, leaving both rivers within the United States. But it cannot be supposed that they had in view the intersection of Sabine River with any degree of latitude other than the true 32d degree of latitude, nor the crossing of the line extending along the Red River westward with any meridian of longitude other than the true 100th meridian. The fourth article of the treaty shows that the contracting parties contemplated that the line should be fixed with more precision than it was then possible to do; and to that end provision was made for the appointment of commissioners and surveyors, who should run and mark it, and designate exactly the limits of both nations — the results of such proceedings, it was declared, to be considered part of the treaty, having the same force as if

inserted therein. Melish's map of 1818 was taken as a general basis for the adjustment of boundaries, but the rights of the two nations were made subject to the location of the lines, with more precision, at a subsequent time, by commissioners and surveyors appointed by the respective governments. So far as is disclosed by the diplomatic correspondence that preceded the treaty, the negotiators assumed for the purposes of a settlement of their controversy that Melish's map was, in the main, correct. · But they did not and could not know that it was accurate in all respects. Hence they were willing to take it as the basis of a final settlement, the fixing of the line with more precision, and the designating of the limits of the two nations with more exactness, to be the work of commissioners and surveyors, who were to meet at a named time, and the result of whose work should become a part of the treaty. While the line agreed upon was, speaking generally, to be as laid down on Melish's map, it was to be fixed with more precision, and designated with more exactness, by representatives of the two nations.

But there is another, and, perhaps, stronger view of this question, and which is equally conclusive, even if the 100th meridian originally contemplated by the treaty of 1819 were assumed to have been the erroneous meridian line of Melish's map. This view rests upon the official acts of the general government and of Texas, and requires that the present controversy shall be determined upon the basis that the line, which by the treaty was to follow "the course of the Rio Roxo westward," extends to the true 100th meridian, thence by a line due north.

As heretofore stated, the Republic of Texas, by an act passed December 19, 1836, declared that its civil and political jurisdiction extended to the following boundaries: "Beginning at the mouth of the Sabine River and running west along the Gulf of Mexico three leagues from the land, to the mouth of the Rio Grande; thence up the principal stream of said river to its source; thence due north to the forty-second degree of north latitude; thence along the boundary line as defined in the treaty between the United States and Spain, to

the beginning." The President of that Republic was authorized and required by the same act to open a negotiation with the United States to ascertain and define the boundary as agreed upon in that treaty. 1 Sayles' Early Laws of Texas, Art. 257. This boundary had not been defined when Texas was admitted as a State into the Union, with the territory " properly included within and rightfully belonging to the Republic of Texas." The settlement of that question, together with certain claims made by Texas against the United States, were among the subjects that engaged the attention of Congress during the consideration of the various measures constituting the Compromises of 1850. The result was the passage of the above act of September 9, 1850, c. 49, the provisions of which were promptly accepted by the State of Texas. This legislation of the two governments constituted a convention or contract in respect of all matters embraced by it. The settlement of 1850 fixed the boundary of Texas " on the north " to commence at the point at which *the 100th meridian* intersects the parallel of 36° 30' north latitude, and from that point the northern line ran due west to the 103d meridian, thence due south to the 32d degree of north latitude, thence on that parallel to the Rio Bravo del Norte, and thence with the channel of that river to the gulf of Mexico. Texas, in the same settlement, ceded its claim to territory exterior to the limits and boundaries so established, and relinquished all claims upon the United States for liability for its debts, and for compensation or indemnity for the surrender to the United States of its ships, forts, arsenals, custom houses, custom-house revenues, arms and munitions of war and public buildings, with their sites, which became the property of the United States at the time of the admission of the State into the Union. In consideration of that establishment of boundaries, cession of claim to territory, and relinquishment of claims, the United States agreed to pay and has paid to Texas the sum of ten millions of dollars. 9 Stat. 446.

The words " the meridian of one hundred degrees west from Greenwich," in the act of 1850, manifestly refer to the true 100th meridian, and not to the 100th meridian as located

on the Melish map of 1818. The precise location of that meridian has not been left in doubt by the two governments. The United States has erected a monument at the point where the 100th meridian is intersected by the parallel of 36° 30' north latitude. This was done many years ago, upon actual survey, and Texas has, by its legislation, often recognized the true 100th meridian to be as located by the United States. Looking at the above map of 1892, it will be seen that the counties of Lipscomb, Hemphill, Wheeler, Collingsworth and Childress are all immediately west of the 100th meridian. These counties were established in 1876. 3 Sayles' Early Laws of Texas, Art. 4285. The boundaries of each, as defined in the legislative enactments of Texas, are given in the margin.[1] It will be seen that the eastern boundary of each county is the 100th meridian. By the act creating Lipscomb County, its boundary immediately south of the parallel of 36° 30' north latitude, begins "at a monument on the intersection of the 100th meridian and the thirty-sixth and a half degree of latitude." That monument is the one established by the United States after the settlement of 1850. Peculiarly significant is the boundary of Childress County, one of the lines of which runs up Prairie Dog Town River — which river, the United States insists, constitutes the southern boundary of

---

[1] *The county of Lipscomb.* — Beginning at a monument on the intersection of the one hundredth meridian, and the thirty-sixth and a half (36½) degree of latitude, 1629 feet north of the 132d mile post *on the one hundredth meridian;* thence west thirty miles to the thirtieth mile post on the 36½ degree of latitude; thence south thirty miles and 1629 feet; thence east thirty miles to the 102d mile post; thence north thirty miles and 1629 feet to the beginning.

*The county of Hemphill.* — Beginning at the northeast corner of Roberts County, and the southeast corner of Ochiltree County and southwest corner of Lipscomb County; thence east thirty miles to the southeast corner of Lipscomb County, to the 102d mile post *on the one hundredth meridian;* thence south thirty miles to the 72d mile post; thence west thirty miles to the southeast corner of Roberts County; thence north thirty miles to the place of beginning.

*The county of Wheeler.* — Beginning at the 72d mile post, on the one hundredth meridian, the southeast corner of Hemphill County; thence west thirty miles to the southwest corner of Hemphill County and the southeast

the territory in dispute — "to the initial monument on the 100th meridian." The "initial monument" here referred to was erected in 1857 under the authority of the United States to mark the place where, as its representatives then and have ever since claimed, the line, "following the course of the Rio Roxo westward," crossed the 100th meridian.

It thus appears that the two governments, with knowledge that the treaty of 1819 referred to Melish's map of 1818, have, by official action, declared that the 100th meridian is located on the line that marks the eastern boundaries of the counties of Lipscomb, Hemphill, Wheeler and Collingsworth, in the State of Texas. Besides, the proof in the cause leaves no room to doubt that the true 100th meridian is, as shown by the above map of 1892, immediately east of those counties. The acts of the two governments and the evidence, therefore, concur in showing that the 100th meridian is not correctly delineated on the Melish map of 1818. And in the above settlement of a part of the boundary lines between the United States and Texas, the two governments have accepted the true 100th meridian and discarded the Melish 100th meridian. Giving effect to the compromise act of 1850, the suggestion that the 100th meridian must be taken, in the present controversy, to be as located on the Melish map of 1818, is wholly inadmissible. It cannot be supposed that the United States

corner of Roberts County; thence south thirty miles; thence east thirty miles to the 42d mile post, *on the one hundredth meridian;* thence north thirty miles to the place of beginning.

*The county of Collingsworth.* — Beginning at the northeast corner of Donley County and southeast corner of Gray County, and southwest corner of Wheeler County; thence east thirty miles to the southeast corner of Wheeler County at the 42d mile post, *on the one hundredth meridian;* thence south thirty miles; thence west thirty miles to the southeast corner of Donley County; thence north thirty miles to the place of beginning.

*The county of Childress.* — Beginning at the southeast corner of Collingsworth County at the 12th mile post, *on the one hundredth meridian;* thence west 23 miles; thence south thirty miles; thence east about thirty-five miles, to the new west line of Hardeman County; thence north to Prairie Dog Town River; thence up said river to the *initial monument on the one hundredth meridian;* thence north to the 12th mile post at the place of beginning. 3 Sayles' Early Laws of Texas, Art. 4285.

would have agreed to pay ten millions of dollars to the State of Texas, as provided in the act of 1850, if it had been suggested that any dispute in respect of boundary not covered by that act, and so far as such dispute depended upon degrees of longitude, was to be determined otherwise than by reference to the true 100th meridian. Assuming that the two governments did not intend by the settlement of 1850 to fix the point where the line, "following the course of the Rio Roxo westward," crossed the 100th meridian, nevertheless it is inconceivable that the two governments intended that, in establishing the boundary of Texas "on the north," the 100th meridian mentioned in the enactment of 1850 should be the true 100th meridian, but that the State should be at liberty to insist, in respect of its boundary *along Red River*, that the 100th meridian be taken to be as delineated on the Melish map, and thereby obtain all the land, within the limits of Indian Territory, between the true 100th meridian and the Melish 100th meridian.

We have said that the treaty itself, upon a reasonable interpretation of its provisions, left it open to the contracting parties, through commissioners and surveyors, to fix the lines with precision, and, therefore, to show, by competent evidence, where the true 100th meridian was located. But if this were not so, we should feel obliged to hold that the convention or contract between the United States and Texas, as embraced in their respective enactments of 1850, together with the subsequent acts of the two governments, require in the determination of the present controversy that the 100th meridian, mentioned in the treaty of 1819, be taken to be the true 100th meridian, and, consequently, that the line, "following the course of the Rio Roxo westward to the degree of longitude 100 west from London," must go, and was intended to go, to the true or actual 100th meridian, and not stop at the Melish 100th meridian.

So that the real question for solution is whether, as contended by the United States, the line "following the course of the Rio Roxo *westward* to the degree of longitude 100 west from London," meets the 100th meridian at the point where

Prairie Dog Town Fork of Red River crosses that meridian, or whether, as contended by the State, it goes *northwestwardly* up the North Fork of Red River until *that* river crosses the 100th meridian many miles due north of the initial monument established by the United States in 1857.

Upon this point the evidence is very voluminous. Much of it, we feel constrained to say, is of little value, and tends only to confuse the mind in its efforts to ascertain what was within the contemplation of the negotiators of 1819.

It is a matter of regret that the question now presented, involving interests of great magnitude, should not have been determined, in some satisfactory mode, before or shortly after Texas was admitted as one of the States of the Union. It has remained unsettled for so long a time that it is not now so easy of solution as it would have been when the facts were fresh in the minds of living witnesses who had more intimate knowledge of the circumstances than any one can now possibly have upon the most thorough investigation.

Before looking at the Melish map of 1818, it will be proper to inquire as to the general course of Red River, so far as any information had been given to the public prior to the making of that map. Probably the most trustworthy publication on the subject is Pike's "Account of expeditions to the sources of the Mississippi and through the western parts of Louisiana to the source of the Arkansaw, Kans, La Platte and Pierre Juan Rivers, performed by order of the government of the United States, during the years 1805, 1806 and 1807; and a tour through the interior parts of New Spain, when conducted through these provinces by order of the Captain General in the year 1807." This work was copyrighted in 1808 and published at Philadelphia in 1810. It was illustrated by numerous charts, copies of which are found on pages 44, 45, 46, 47, *post* — one of them being "A Chart of the Internal Part of Louisiana," the other, " A Map of the Internal Provinces of New Spain." Those charts show a large river called Red River, extending from a point near Santa Fé between latitude 37° and 38° across what is now the State of Texas, passing Natchitoches, Louisiana. Both show a chain of mountains

Opinion of the Court.

No: 3.   Western Half.

PIKE'S CHART OF THE INTERNAL PART
OF LOUISIANA, &c.—PT.-1—1810.

Opinion of the Court.

No. 4.  Eastern Half.

PIKE'S MAP OF THE INTERNAL PROVINCES
OF NEW SPAIN—1810.

running north and south, marked on one chart as "White snow capped mountains, very high."

These are undoubtedly the Snow Mountains referred to in the letter of Mr. Adams to the Spanish minister, of October 31, 1818, in which, as we have seen, the former proposed that the line from east to west should follow the course of Red River "to its source, touching the chain of the Snow Mountains, in latitude 37° 25′ north, longitude 106° 15′ west, or thereabouts." East of the Snow Mountains, as delineated on these charts, are two prongs or small streams, "Rio Rojo" and "Rio Moro," the source of the former being northeast, and the latter nearly east, of Santa Fé. The Rio Rojo rises between the 37th and 38th, and the Rio Moro between the 36th and 37th degrees of latitude, both near the 106th degree of longitude. Between those prongs, on one of the charts, are the words "Source of Red River of the Mississippi." The prongs or streams Rio Rojo and Rio Moro unite at about the 37th degree of latitude, and form one stream, marked on one chart as Red River, and on the other as "Rio Colorado [Red River] of Natchitoches." The stream, thus formed, runs for a short distance eastwardly, then southeastwardly until it reaches a point a little west of the 100th meridian, then eastwardly, then a little northeastwardly, then southeastwardly, passing Natchitoches, to a junction with the Wichita River near the Mississippi River. It should also be stated that on these charts is marked a road or line extending from Tous, (which is north of Santa Fé,) through a gap of the Snow Mountains, and thence along the north side of Red River. That line is described as "The route pursued by the Spanish cavalry when going out from Santa Fé in search of the American exploring parties commanded by Major Sparks and Captain Pike in the year 1806." These charts or maps, in connection with the chart of the lower part of Red River, not here reproduced, also show throughout the entire distance from Natchitoches to the source of Red River near the Snow Mountains, small streams emptying into the main river from the north and northwest, none of which, however, are marked with names; and that north of Red River, as delineated by

Pike, and east of the 100th meridian of longitude, is an unnamed stream, not of great length, but having the same general course as the stream now known as the North Fork of Red River.

That prior to Melish's map of 1818 it was believed that the Red River that passed Natchitoches had its source in the mountains near Santa Fé is manifest from Melish's own publications. In 1816 he published at Philadelphia a small book, with the title "A geographical description of the United States with the contiguous British and Spanish possessions." It accompanied his map of those countries. In that work it appears that he used Humboldt's map of 1804, and Pike's Travels. He said : "The Red River rises in the mountains to the eastward of Santa Fé, between north latitude 37° and 38°, and, pursuing a general southeast course, makes several remarkable bends, as exhibited on the map ; but it receives no very considerable streams until it forms a junction with the Wachitta, and its great mass of waters, a few miles before it reaches the Mississippi." pp. 13 and 39. See also the third edition of his work published in 1818, pp. 14 and 42.

On Darby's map of the United States, including Louisiana, published in 1818, and prefixed to his "Emigrant's Guide," appears the "Red River of Natchitoches," formed by two prongs, and extending southeastwardly from a point near the intersection of the 107th degree of longitude and the 40th degree of latitude to its junction with waters near the Mississippi. East of the 100th meridian are two unnamed streams coming from the northwest, each much shorter than the main Red River, as delineated on that map. It is stated in this work that the Red River "rises near Santa Fé in N. lat. 37° 30' and 29° west of Washington, runs nearly parallel to the Arkansas, joins the Mississippi at 31° N. lat. after a comparative course of 1100 miles." p. 50.

In view of the facts stated, particularly in view of Melish's knowledge of Pike's publication and the statements in his own work, it cannot be doubted that when the Melish map of 1818 was published it was believed that there was a Red River that continued without break from its source near Sante Fé or the

Snow Mountains until it joined other waters east and southeast of Natchitoches, near the Mississippi.

Following the course of Red River, as laid down on the Melish map of 1818, it is impossible to doubt that in the mind of Melish the Red River was the stream represented by Pike as having two prongs, Rio Rojo and Rio Moro, near Santa Fé, and as running without break, first easterly, then southeastwardly, then eastwardly for a comparatively short distance, and then southeastwardly to its mouth near the Mississippi River. On the north and east of Red River, as thus marked, there was no stream connected with it that was marked by any name. There was an unnamed stream, on the north side of the main river, which emptied into the latter between the 101st and 102d degrees of west longitude *as defined on that map.* If regard be had alone to the map of 1818, it is more than probable that the river marked on it as having near its source two prongs, Rio Rojo and Rio Moro, and which formed one stream that continued without break southeastwardly, and *into which,* between the 101st and 102d degrees of longitude, as *marked on that map,* came from the northwest an unnamed stream, was the river designated on Pike's chart as Red River, and was the Red River of the treaty of 1819. The suggestion that the river marked on the Melish map as having the two prongs, Rio Rojo and Rio Moro, and running southeastwardly, was the river now known as the North Fork of the Red River, is without any substantial foundation upon which to rest. If the latter river is delineated at all on the Melish map, it is the unnamed stream that entered the main river from the northwest, between the 101st and 102d meridians as located on that map.

There is a large amount of evidence of a documentary character showing that this interpretation of the Melish map is correct. We have before us "A map of the United States, with the contiguous British and Spanish possessions, compiled from the latest and best authorities by John Melish." It was copyrighted June 16, 1820, and published at Philadelphia by Finlayson, the successor of Melish. A part of that map is reproduced on pages 52, 53. It is spoken of as Melish's map of 1823, because that is the year to which it was improved.

From that map it appears that a line up the Rio Roxo or Red River, from the northeastern corner of Texas to the 100th meridian, is substantially an east and west line, and that west of the 100th meridian it is westward and northwestwardly *to a point near Santa Fé and the Snow Mountains.*

If the case depended upon that map it could not be doubted that the territory in dispute is outside of the limits of Texas. The direction of the treaty is to run *westward*, not northwestwardly, on Red River *to the* 100th *meridian.* According to the view pressed by the State, the true line extends, from the junction of the North Fork of Red River with Red River, northwardly, then easterly, then northwestwardly *up that fork*, although at such junction there is another wide stream, coming almost directly from the west, and which fully meets the requirement of the treaty to follow the course of the Red River *westwardly* to the 100th meridian. We do not feel authorized to assent to this view. In our judgment the direction in the treaty to follow the course of the Red River *westward* to the 100th meridian takes the line, not up the North Fork, but westwardly with the river now known as the Prairie Dog Town Fork, or South Fork of Red River, until it reaches that meridian, thence due north to the point where Texas agreed that its line "on the north" should commence.

This conclusion is strongly fortified by an inspection of the numerous maps placed before us, and which were made prior to February 8, 1860, on which day the legislature of Texas, with knowledge that the territory in dispute was claimed by the United States, passed an act creating the county of Greer, and thereby assumed that it was part of the territory properly and rightfully belonging to that State, at the time its independence was achieved, as well as when it was admitted into the Union. 2 Sayles' Early Laws of Texas, Art. 2886. Every map before us, published after the treaty of 1819 and prior to 1860, beginning with the Melish map of 1823, shows that the line, going from east to west, followed the course of Red River westward until it crossed the true 100th meridian at or near the southwest corner of the territory designated as "Unassigned Land." Upon each and all of these maps appear

Opinion of the Court.

No. 5.   Melish Map of 1823, Western Half.

No. 5.   Melish   Map of 1823, Eastern Half.

streams coming from the northwest, having a northwest and southeast course, that empty into the main river. But none of those streams are marked as a part of the line established by the treaty of 1819.

Among the maps to which we refer are the following: 1. "A map of Mexico, Louisiana and the Missouri Territory, including the States of Mississippi, Alabama Territory, East and West Florida, Georgia, South Carolina and part of the Island of Cuba," by John.H. Robinson, M.D., copyrighted in 1819, and published at Philadelphia. The author is no doubt the gentleman of the same name who accompanied Major Pike in his expeditions, and is spoken of by that officer as a man of enterprise and science. The river marked on that map as Red River east of the 100th meridian has its source in the region of Santa Fé, and corresponds with the Red River or the Rio Colorado of Natchitoches, as delineated on Pike's map. 2. Morse's map of the United States, published in 1822, and which accompanied an official report, made by him in that year to the Secretary of War, of the conditions of the various Indian tribes of the country. On this map appears Red River with its source not far from Santa Fé, and running southeastwardly to a short distance west of the 100th meridian, from which point it extends eastwardly all along the southern line of Indian Territory, thence southeastwardly to the Mississippi. 3. Carey & Lea's Atlas of 1822. On this map appears Red River having a *westward* course the entire distance from about the 94th to the 102d degree of longitude, between the 33d and 34th degrees of latitude, and constituting the southern line of the Indian Territory. Red River on this map has its source near the Snow Mountains. 4. The map of Major Long, of the Topographical Engineers, inscribed to Mr. Calhoun, Secretary of War, and published in 1822. On this map appears a river with its source near the mountains of Santa Fé, and running southeastwardly, then eastwardly to the 100th meridian, and continuing then eastwardly along the entire line between Indian Territory and Texas. As delineated on Long's map, between the 103d and 101st meridians, that river is marked " Rio Roxo or Red River," and near the

95th meridian it is marked "Red River." 5. Tanner's map of North America, 1822. 6. Tanner's map of North America (1823) shows a river on the south border of what is now Indian Territory, marked Red River. On each side of it, after it passes the 100th meridian, there are prongs or streams north and south, and the river, near its end, after it has passed 25° west from Washington, is marked Red River. Going off from the Red River at about 20° longitude west from Washington is the river marked False Washitta, which comes from the northwest. Red River as marked on that map extends nearer to Santa Fé than the False Washitta. 7. Finley's American Atlas (1826) shows Red River on the south boundary of Arkansas, whose course, going from the east, is westward until about the 100th meridian is reached, and west of the 100th meridian it is marked "R. Roxo or Red R." At longitude 20° west from Washington a river comes from the northwest marked False Washitta. The extension marked as above is much longer than any stream emptying into Red River from the north or the northwest. 8. "A Complete historical, chronological and geographical American atlas," published by Carey & Lea, at Philadelphia, in 1826, on which will be found marked Red River, whose course going from east to west, is westwardly past the 100th meridian and then northwestwardly in the direction of Santa Fé. At about the 98th meridian a much shorter stream comes into it from the northwest, and is unmarked. 9. A German atlas of America, published at Leipsic in 1830, contains a map which shows the boundary established in 1819 on the west side of Louisiana, and shows Red River along the whole southern line of the Indian Territory. Coming into that river from the northwest, at 99° longitude, is an unmarked stream; and coming from the northwest, and emptying into Red River, at about 97° longitude, is another stream marked Falsche Washitta. 10. Young's New Map of Texas, published at Philadelphia in 1835 by Mitchell, and a copy of part of which is given on pages 56, 57. On this map appears Red River with its source a short distance from Santa Fé, and marked, east of the 100th meridian, as "Rio Roxo or Red River of Louisi-

No. 6. Western Half.

Opinion of the Court.

No. 6.  Eastern Half.  —

ana," running first southeastwardly, then eastwardly along the southern boundary of Indian Territory. 11. Maillard's map of Texas, published in 1841, showing Red River as forming the line between the Indian Territory and Texas from about the 94th degree of longitude to the 100th meridian, having a course westward and eastward between those meridians, and marked, on the map, east of the 100th meridian, as "Rio Roxo or Red River of Louisiana." 12. A map compiled for the Department of State, under the direction of Colonel Abert and Lieutenant Emory, and published by the War Department in 1844. On this map appears Red River, whose course going from east to west, from a point near the 94th degree of longitude, is substantially westward along the whole line between the Indian Territory and Texas. After passing the 100th meridian, its course is westwardly and northwestwardly in the direction of Santa Fé. 13. Tanner's map of the United States and Mexico, published in 1846. That map shows Red River having an eastward and westward course, just south of the 34th degree of latitude, and marking the southern line of Indian Territory. 14. Colton's map of the United States, published in 1848, shows Red River forking near the 98th meridian, one fork extending westwardly and northwestwardly toward Santa Fé, marked Rio Roxo or Red River between 100° and 102°, and Red River between 102° and 104°. 15. Cordova's map of the State of Texas, "compiled from the records of the general land office of the State by Robert Creuzbaur," and published in 1849. Creuzbaur entered the land office in Texas before the admission of that State into the Union, and remained there for many years. While there he never heard of any claim by Texas to the territory now called Greer County. Upon the original of this map is a certificate by Thomas W. Ward, commissioner of the land office of Texas from January 5, 1841, to March 20, 1848, and also a certificate by his successor, George W. Smyth. Ward certified that the map had been compiled by Creuzbaur from the records of the general land office of Texas, and that it was the most correct representation of the State he had seen or which had come to his knowledge; "the meanders of

the rivers are all correctly represented, being made from actual survey." Smyth certified that he "has no hesitancy in declaring it as his firm conviction that this map is a very correct representation of the State, representing all returns up to date, having been compiled with great care from the records of the general land office." On this map is also the certificate of the governor and secretary of state as to the official character of Ward and Smyth. It is further attested, under date of August 12, 1848, by Senators Rusk and Houston, and by Representatives Kauffman and Pilsbury, as follows: "We, the undersigned Senators and Representatives from the State of Texas, do hereby certify that we have carefully examined J. de Cordova's map of the State of Texas, compiled by R. Creuzbaur from the records of the general land office of Texas, and have no hesitation in saying that no map could surpass this in accuracy and fidelity. It has delineated upon it every county in the State, its towns, rivers and streams, and we cordially recommend it to every person who desires correct geographical information of our State. To the persons desirous of visiting Texas it would be invaluable." 16. Mitchell's New Atlas of North and South America, published by Thomas Cowperthwaite & Co., Philadelphia, 1851, shows on the map of Texas a river marked Red River, whose course, after the latitude midway between 33° and 34° is reached, is westward. It continues in a westerly direction with scarcely any change until it reaches the 102d meridian, and then turns northwestwardly in the direction of Santa Fé.

All of these maps place the territory in dispute east of the 100th meridian and *north* of the southern line of the Indian Territory *as that line is claimed by the United States.* They are all inaccurate, if any part of that territory is within the limits of Texas. No one of them so locates Red River that its course, going westward (from the point where the line between Texas and Louisiana intersects the Red River) to the 100th meridian would take the line of the treaty of 1819 up the North Fork of Red River until it intersected that meridian near the 35th degree of latitude.

The conclusion to be drawn from the maps to which we

have referred is sustained by other maps, namely: 1. A map of the State of Texas purporting to have been compiled by Stephen F. Austin and published at Philadelphia by H. S. Tanner in 1837. The original is in the general land office of Texas, and upon it is the certificate of the commissioner of such land office, dated March 13, 1882, showing that it was temporarily deposited in that office. 2. A map of Texas purporting to have been compiled from surveys on record in the general land office of the Republic of Texas, in the year 1839, by Richard S. Hunt and Jesse F. Randel. Upon this map is a certificate of the secretary of state of Texas, approving the map, and stating that it had been compiled "from the best and most recent authorities." This certificate is followed by one from the commissioner of the general land office of the Republic of Texas, dated April 25, 1839, stating that "the compiler of this map has had access to the records of this office, and that the map was compiled from them." 3. Disturnel's map of the United States of Mexico, published in 1847 and used at the making of the treaty of Guadalupe Hidalgo. 4. A map prepared for the President of the United States under the direction of the commissioner of the land office in 1849. 5. A Travellers' map of the State of Texas, "compiled from the records of the general land office, the maps of the Coast Survey, the reports of the boundary commission, and various other military surveys and reconnoissances, by Charles W. Pressler." This map was published in 1867. The author held a position in the land office of Texas for more than thirty years.

But it is said that the United States has in many ways, and during a very long period, recognized the claim of Texas to the territory in dispute, and upon principles of justice and equity should not be heard at this late day to question the title of the State.

Is there any basis for the suggestion that the United States has ever acquiesced in the claim of the State that the treaty line *westward* along Red River to the 100th meridian follows the course of the North Fork from its mouth northwardly and northwestwardly until that meridian is reached at a point

north of the 35th degree of latitude? This question deserves the most careful examination, for, long acquiescence by the General Government in the claim of Texas would be entitled to great weight.

In support of the suggestion that the United States has recognized the claim of Texas, reference is made to the fact that in 1843 some Texan troops under the command of Colonel Snively went into the territory here in dispute and were arrested and disarmed by Captain Cooke of the United States Army, who had been specially assigned to the duty of protecting caravans of Santa Fé traders through the territories of the United States to the Texan frontier. Of his conduct the Republic of Texas complained. Connected with that matter was an alleged forcible entry into the custom house at Bryarly's Landing on Red River by certain citizens of the United States, and the taking therefrom of goods that had been seized as forfeited under the laws of Texas. The settlement of that dispute between the two governments is now relied on as showing a recognition by the United States of the claim of Texas to the territory here in controversy. We have been unable to find anything in the history of those proceedings to justify this contention of the State. From the letter of Mr. Calhoun, Secretary of State, to Mr. Van Zandt, Chargé d'affaires of the Republic of Texas, of date August 14, 1844, it appears that Captain Cooke's conduct in this matter was made the subject of a court of inquiry. Mr. Calhoun said: "The court was ordered, at the request of my immediate predecessor, in conformity to the intimation contained in his communication to Mr. Van Zandt, of the 19th of January last, in order to ascertain more fully and in the most authentic form the circumstances and facts connected with the proceedings of Captain Cooke and his command, in the disarming of the Texan force under the command of Colonel Snively. Mr. Van Zandt will find, on recurring to the extract, that the opinion of the court is, that the place where the Texan force was disarmed was *within the territory of the United States;* that there was nothing in the conduct of Captain Cooke which was harsh or unbecoming, and that he did not exceed the

authority derived from the orders under which he acted. It is proper to add that the court consisted of three officers of experience and high standing; that the case was fully laid before it, and that its opinion *appears to be fully sustained by the evidence.* There seems to be no doubt that Captain Cooke was sincerely of the opinion that the Texan force was within the territory of the United States, and that the fulfilment of his orders to protect the trade made it his duty, under such circumstances, to disarm them. It is readily conceded that the commander of the Texan forces, with equal sincerity, believed the place he occupied was within the territory of Texas. Which was right or which wrong can be ascertained with certainty only by an actual survey and demarcation of the line dividing the two countries between the Red and Arkansas Rivers." After observing that it was neither necessary nor advisable to renew between the two governments the discussion on the question whether the Texan force was or was not within the limits of the United States, Mr. Calhoun proceeded : " In the hope, therefore, of closing the discussion and putting an end to this exciting subject, the undersigned renews the offer of his predecessor contained in the communication above refered to, ' to restore the arms taken from the Texan force, or to make compensation for them,' and his assurance, given at the same time that ' his government never meditated and will not sanction any indignity towards the government of Texas, nor any wrong towards her people, and will repair any injury of either kind which may be made to appear.' " This offer was accepted by the government of Texas, its Chargé d'affaires saying : " As it is not probable that the arms could be returned in the order in which they were taken, compensation will be received for them." House Ex. Doc. 28th Congr. 2d Sess. Vol. 1, pp. 12, 109–10. This was followed by an appropriation by Congress by the act of March 30, 1847, c. 47, of a sum of not exceeding $30,000, " for settling the claims of the late Republic of Texas, according to principles of justice and equity, for disarming a body of Texan troops under the command of Colonel Snively, and for entering the custom house at Bryarly's Landing, and tak-

ing certain goods therefrom." 9 Stat. 155, 168. It seems to the court too clear to require discussion that, while, during the above controversy, the United States and Texas asserted their authority, respectively, over the place where the Texan troops were disarmed, the determination of the question of territorial boundary was expressly waived, and a settlement was reached, upon the basis indicated in the diplomatic correspondence and in the act of Congress solely (to use the words of Mr. Calhoun) to allay "irritated feelings between two countries, whose interest it is to be on the most friendly terms."

Proceeding with the inquiry whether the United States has recognized the claim of Texas to own the territory in dispute, we find that by the treaty of June 22, 1855, between the United States and the Choctaw and Chickasaw Indians, the boundary of the Choctaw and Chickasaw country was thus defined: "Beginning at a point on the Arkansas River, one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running thence due south to Red River; thence up Red River to the point *where the meridian of one hundred degrees west longitude crosses the same;* thence north along said meridian to the main Canadian River; thence down said river to its junction with the Arkansas River; thence down said river to the place of beginning." 11 Stat. 611, 612. It may be here stated that the Kiowas, Comanches and Apaches were settled in the Choctaw and Chickasaw country, as originally defined, in virtue of the treaty of 1867. 15 Stat. 581, 582. In execution of the treaty of 1855 the Commissioner of Indian Affairs made a contract with A. H. Jones and H. M. C. Brown for a survey of some of the boundaries of the original Choctaw and Chickasaw country. From the field-notes of those surveyors, which were duly reported to the proper office, and certified to be correct by the astronomer and examiner of the Indian Boundary Survey, we make these extracts: "The initial monument for the 100th meridian west longitude boundary line between the State of Texas and the Choctaw and Chickasaw countries is established 30 chs. dist. from the north bank of Red River on an elevation near 50 ft. above the bed of the same. The situ-

ation was selected with a view to protect the monument so as never to be destroyed by high water. . . . The river due south from the monument is 76 chs. and 85 lks. wide from high water mark to high water mark. Course N. 85° E. It will be sufficient to say to those interested that there can be no doubt as to the fact of its being the main branch of Red River, as was doubted by some persons with whom we had conversed relative to the matter before seeing it, for the reason the channel is larger than all the rest of the tributaries combined, besides affording its equal share of water, though like the other branches in many places the water is swallowed up by its broad and extensive sand beds, but water can at any season of the year be obtained from one to three feet in main bed of stream."

We come now to the act of June 5, 1858, c. 92, by which (in harmony with the act of the legislature of Texas of February 11, 1854, 2 Sayles' Early Laws of Texas, Art. 2412) it was provided: "§ 1. That the President of the United States be, and he hereby is, authorized and empowered to appoint a suitable person or persons, who, in conjunction with such person or persons as may be appointed by and on behalf of the State of Texas for the same purpose, shall run and mark the boundary lines between the Territories of the United States and the State of Texas: Beginning at the point where the one hundredth degree of longitude west from Greenwich crosses Red River, and running thence north to the point where said one hundredth degree of longitude intersects the parallel of thirty-six degrees thirty minutes north latitude; and thence west with the said parallel of thirty-six degrees and thirty minutes north latitude to the point where it intersects the one hundred and third degree of longitude west from Greenwich; and thence south with the said one hundred and third degree of longitude to the thirty-second parallel of north latitude; and thence west with the said thirty-second degree of north latitude to the Rio Grande. § 2. That such landmarks shall be established at the said point of beginning on Red River, and at the other corners, and on the said several lines of said boundary, as may be agreed on by the President of the United States, or

those acting under his authority, and the said State of Texas, or those acting under its. authority." 11 Stat. 310.

This act was passed before Jones and Brown had completed and reported the survey made by them. Pursuant to this act of 1858 a commissioner was appointed on behalf of the United States. The Secretary of the Interior in his letter of instructions to that commissioner said, among other things : " After surveying and marking that portion of the boundary defined by the parallel of 36° 30' north latitude, and which is known to you to present no obstacle to a rapid survey and demarcation, to prevent delay and expense, you will take the 100th meridian of west longitude as laid down on the map of the southern boundary of Kansas, or as determined and marked upon the. surface of the earth by Messrs. Jones and Brown, surveyors of the Chickasaw and Choctaw boundaries, from observations made by Daniel G. Major, astronomer on the part of the United States, at its intersection with the Northern Creek boundary, about midway between the North Fork of the Canadian and the Canadian River, or by independent observations, whichever, in your judgment from comparison, may be found to be the most correct method. Having connected with, or observed for, the 100th meridian at its intersection with the Creek boundary, as determined by the parties above mentioned, you will proceed as rapidly as possible over the remaining. portion of this meridian to Red River, the termination of your field work, making such observations and measurements as you may deem sufficient to verify it." The governor of Texas having insisted upon the work of the survey being commenced on Red River rather than on the north line, the Secretary of the Interior, after saying that that course would involve a. serious delay in fixing the initial point of the 100th meridian, which could only be done after several months of careful astronomical observations and an exchange of observations with some fixed observatory, said : " And, besides, by the time the commissioners of the respective governments are prepared to commence their labors at that point, that line will probably have been determined and marked by the United States surveyors, Messrs. Jones and Brown, who

are now engaged upon the surveys of certain boundaries in the Choctaw and Chickasaw country, under the provisions of the treaty of January 22, 1855. . . . The above named surveyors are provided with a competent astronomer and excellent instruments, and their line will probably require but simple verification on the part of the joint commission; and for all purposes appertaining to the interests of the citizens of Texas along and adjacent to the proposed boundary line north of the Red River, Brown and Jones' survey must prove sufficient and satisfactory."

For reasons that need not be here detailed, the commissioners of the two governments separated before their joint work was concluded. The commissioner of the United States in a preliminary report, November 14, 1860, to the Secretary of the Interior, stated that he commenced his survey by tracing the 100th meridian from its intersection with the Canadian River northward to its intersection with the parallel 36° 30', forming the northeast corner of the boundary. Having traced and marked that parallel to the northwest corner, he returned along the bed of the Canadian River, and came again to the 100th meridian, when he turned southward, and followed that meridian "to its intersection with the south [Prairie Dog Town] or main branch of Red River." In a subsequent report to the Commissioner of the Land Office, under date of September 30, 1861, he said : " That part of the 100th meridian lying between the main branch of Red River " — by which was meant Prairie Dog Town Fork or South Fork — " and the southern boundary of the *Cherokee* country had been determined, run and marked by Messrs. Jones and Brown in 1859, under the direction of the Indian Bureau, as constituting the boundary between Texas and a part of the Indian Territory. So much of the boundary line as was thus established, Hon. Jacob Thompson, then Secretary of the Interior, directed me to adopt, and in pursuance of this instruction I simply retraced the meridian up to where the work of Messrs. Jones and Brown ended. Thence I prolonged it up to its intersection with the parallel 36° 30'."

It should be here stated that the governor of Texas, under

date of April 28, 1860, instructed the commissioner appointed by him to "insist upon the North Fork as the main Rio Roxo or Red River, and as the true boundary line, as described in the treaty of 1819." And just before that date, namely, on the 8th day of February, 1860, when there was no reason to suppose that the United States acquiesced in the claim of Texas, the legislature of that State passed the act heretofore referred to, creating the county of Greer with the following boundary : " Beginning at the confluence of Red River and Prairie Dog River, thence running up Red River, passing the mouth of South Fork and following Main or North Red River to its intersection with the 23d degree of west longitude ; thence due south across Salt Fork and to Prairie Dog River, and thence following that river to the place of beginning." 2 Sayles' Early Laws of Texas, Art. 2886. Of course, the purpose of that enactment was to assert, in solemn form, the claim of the State to the territory in dispute.

During the Civil War, and for many years thereafter, this vexed question did not receive any attention from either government. The reason for this will be understood by every one.

But the fact upon which the State seems to lay most stress is, that on the 24th day of February, 1879, Congress passed an act entitled "An act to create the Northern Judicial District of the State of Texas, and to change the Eastern and Western Judicial Districts of said State, and to fix the time and place of holding courts in said Districts." 20 Stat. 318, c. 97. By the first section of that act it was provided "that a judicial district is hereby created in the State of Texas, to be called the Northern Judicial District of said State, and the territory embraced in the following named counties, as now constituted, shall compose said district, namely." Here follows a list of one hundred and ten counties, including all the recognized counties of Texas (except Red River and Bowie) that are immediately south of the line between the Indian Territory and Texas, as that line is defined on the above map of 1892 ; and midway in this long list appears the word "Greer."

The learned counsel representing the State insist with confi-

dence that this act of Congress should be regarded as an expression of a purpose by the United States to surrender its claim to the territory in dispute, and as a recognition that that territory was a part of Texas. But we cannot so construe it without doing violence to the strong conviction we have that Congress did not, for a moment, intend by this legislation to part with extensive territorial possessions which the General Government had during a long period claimed to be under its exclusive jurisdiction, and outside of the jurisdiction of any State. We have been unable to find in the history of the act of 1879 any intimation or suggestion that the placing of the territory in dispute in the Northern Judicial District of Texas. was made for the purpose of finally determining the controversy as to boundary that had long existed between the United States and Texas. It was entirely competent for Congress for judicial purposes to have included the whole or any part of the Indian Territory within a judicial district established in an adjoining State. If Congress was aware of the state enactment of 1860, the county of Greer might well have been referred to as a county then "constituted," and to be placed, for judicial purposes, within the Northern Judicial District of the State of Texas. Thus the act of 1879 may not unreasonably be interpreted; and we think that any other construction of its provisions would impute an intention to Congress to dispose of an important part of the territory of the United States without disclosing such intention, either by the title of the act passed, or by any words in its body indicating a purpose to settle a disputed question of boundary. The respect due to a coördinate department of the government forbids this court from taking any view of its action that would imply a willingness to accomplish by indirection, or by the use of vague forms. of expression, what, perhaps, could not have been accomplished in an open manner, or by employing such clear, distinct language as the occasion and the interests involved alike demanded.

We are the more inclined to take this view because it is manifest that, prior to the present litigation, the State of Texas never regarded the act of 1879 as recognizing its.

jurisdiction over the territory in question, nor supposed that that act placed Greer County, so called, in the Northern Judicial District of Texas for any except judicial purposes.

In the early part of the year 1882, Senator Maxey of Texas, at the instance of the governor of that State, (and in anticipation of like action by the Texas legislature,) introduced into the Senate of the United States a bill providing for the appointment of a commission to consider the unsettled boundary dispute between the United States and Texas. There was no pretence that the matter had been disposed of by the act of 1879. That bill passed the Senate, but did not pass the House of Representatives. In the latter body a bill was introduced by a Representative from Texas which defined the boundary between the Indian Territory and Texas as follows: " Beginning at the southeast corner of said Indian Territory, in the middle of Red River; thence up said river to the junction of the Prairie Dog Town and North Forks of said river; thence up the middle of said North Fork to the 100th meridian west from London ; thence crossing said North Fork by a line due north to the northeast corner of said State of Texas, as now established." The Judiciary Committee reported adversely to this bill, and, as a substitute for it, reported a joint resolution providing for the appointment of a joint commission to ascertain and mark the point where the 100th meridian crosses Red River, in accordance with the treaty of 1819. House Report No. 1282, 47th Cong. 1st Session. The report of that committee will be found in the margin.[1] It contains

---

[1] *The Committee on the Judiciary, by Mr. Willits, to whom was referred the bill (H. R. 1715) to define the boundary between the Indian Territory and the State of Texas, begs leave to report:*

That said bill seeks by legislative enactment to define said boundary at the point in dispute, as the North Fork of the Red River, instead of the South Fork, commonly called the Prairie Dog Town Fork of the Red River.

The importance of the issue involved may be seen at a glance, when it is observed that the tract in dispute, lying within said two forks of Red River, and bounded on the west by the one hundredth meridian of longitude west of Greenwich, is about 60 miles long and 40 miles wide, probably over 2000 square miles, and containing a large amount of valuable land. If

a full statement of the views entertained by that committee in opposition to the claim of the State.

In the same year the State of Texas, by an act approved

---

this tract is a part of Texas, the lands belong to that State under the act of her admission, while if it is a part of the area of the Indian Territory it becomes a portion of the public domain.

The real question in dispute is which branch or fork of Red River is its main branch, or the continuation of the river. The initial point of investigation is the treaty between the United States and Spain, dated February 22, 1819, in which this part of the boundary is defined as follows: After it strikes the "Rio Roxo of Natchitoches or Red River," it then follows "the course of the Rio Roxo westward to the degree of longitude 100 west from London and 23 from Washington; then crossing said Red River and running thence by a line due north to the Arkansas, etc. . . . the whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the 1st of January, 1818."

By this it will be seen that the western boundary of that portion of the United States lying on the north of the Red River was said one hundredth meridian, and that its southwestern corner was where said meridian crosses the river. At the date of that treaty this region had never been accurately explored, and the fact was not known that Red River divided into two branches before it reached said meridian; in fact, the very map referred to in the treaty makes the river a continuous stream, and does not lay down the North Fork at all. Subsequent surveys have discovered the two forks, and have definitely located said one hundredth meridian about 80 miles west of where the two forks form the river proper. The treaty with Mexico dated January 12, 1828, recognizes the boundary as stipulated in the aforesaid treaty with Spain, as did the joint resolution admitting Texas into the Union. Even at as late a date as her admission into the Union there was no knowledge of uncertainty in this boundary. Lieutenant Emory made a map for the War Department in 1844 (which is now in the Land Office), on which the North Fork is not laid down, and on that Red River traces nearly the course of the Prairie Dog Town Fork. Disturnell's map of Mexico, dated 1848, follows in this regard Emory's and Melish's maps.

The first accurate knowledge of these streams seems to have been obtained by Captain R. B. Marcy and Captain George B. McClellan, who, under the direction of the War Department, explored the headwaters of the Red River in 1852, and made an elaborate report, which was published under the authority of Congress. (See Ex. Doc. Senate, No. 54, Thirty-second Congress, Second Session.)

Even this report did not develop the data for this dispute, as Captain McClellan, doubtless from the inaccuracy of his instruments, located said one hundredth meridian below the fork of the river several miles, over one degree of longitude east of its actual location.

May 2, 1882, authorized and empowered its governor "to appoint a suitable person or persons, who, in conjunction with such person or persons as may be appointed by, or on

---

The question does not seem to have arisen until after the astronomical survey of said meridian by Messrs. Jones and Brown in 1857 to 1859, in pursuance of a contract between them and the Commissioner of Indian Affairs, who wished to know the boundary line between the Choctaw and Chickasaw country. They located the one hundredth meridian, as before stated, some 80 miles west of the junction of the two forks, and they designated the Prairie Dog Town branch as the main branch of the Red River.

It appears that this designation was at once questioned by Texas, and, at the instigation of the Senators of that State, Congress passed an act, approved June 5, 1858, 11 U. S. Stat. 319, authorizing the President in conjunction with the State of Texas to run and mark said boundary line. Commissioners were appointed on the part of the United States and of Texas, who proceeded to their work in May and June, 1860.

Governor Sam Houston of Texas instructed the commissioner of that State as follows:

"In the prosecution, then, of the survey you will be guided by Melish's map, and insist upon the North Fork as the main Rio Roxo or Red River, and as the true boundary line, as described in the treaty of 1819."

He refers in his letters of instructions to the Marcy survey, and claims that Marcy was clearly of the opinion that the North Fork was the true Rio Roxo, or Red River proper, and further claims that said map of Melish's lays down the North Fork as the main prong.

The commissioners were unable to agree, the one on the part of the United States claiming that at and across the Red River and to a point about half way from the North Fork to the Canadian River the line had been definitely located by Messrs. Jones and Brown the year before, and that nothing now remained but to extend the line north to latitude 36° 30', its northern extremity. To this the commissioner on the part of Texas objected, and the latter proceeded south to the North Fork, and placed a monument thereon on the north bank fifteen feet in diameter and seven feet high, claiming that as the true southwest corner of Indian Territory, and reported his doings to the governor of Texas. The commissioner on the part of the United States seems never to have completed his report.

Texas adopted and acted upon the report of her commissioner as settling the question of boundary, and established the territory in dispute as a county of that State, naming it Greer, and has assumed jurisdiction over it; and by an inadvertence, not singular in our legislative history, the United States by act of Congress approved February 24, 1879, 20 U. S. Stat. 318, included said county of Greer as a part of Texas in the Northern Judicial District of that State, not annexing it for judicial purposes, but recognizing it apparently as an integral part of Texas.

behalf of, the United States, for the same purpose, shall run and mark the boundary line between the Territories of the United States and the State of Texas, as follows: Beginning at a point where a line drawn north from the intersection of the thirty-second degree of north latitude with the western bank of the Sabine River crosses Red River, and thence following the course of said river westwardly to the degree of longitude one hundred west from London, and twenty-three degrees west from Washington, as said line was laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, 1818, and designated

---

It is manifest, therefore, that some means should be taken to settle this dispute as soon as possible. Conflicts are arising between the United States authorities and persons claiming to exercise rights on the disputed tract under the jurisdiction of the State of Texas; bloodshed and even death has resulted from this conflict. As long ago as May, 1877, the attention of the Secretary of the Interior was called to the dispute by the War Department, and the Secretary of the Interior replied to the letter of inquiry under date of May 10, 1877, which letter we add as part of this report.

On a careful review of the facts in the case — for the question as to which prong of the river is the true river is really a question of fact — your committee is decidedly of the opinion that the South Fork is the true boundary, and that therefore the claim of the State of Texas is unwarranted.

So far from Captain Marcy being clearly of the opinion, as Governor Houston claimed, that the North Fork is the main branch, his final opinion was in favor of the South Fork. It is true that in his diary, on the day he struck the North Fork, he used the language attributed to him, under the date of May 26, to wit:

"We are now in the immediate vicinity of the Wichita Mountains [a range of mountains lying east by northeast from the mouth of Otter Creek, which empties into the North Fork, and where he was encamped]. Red River, which passes directly through the western extremity of the chain, is different in character at the mouth of Otter Creek from what it is below the junction of the Ke-che-ah-que-ho-no (the Dog Town Fork)."

But he had been for several days travelling along the north bank of the Red River west, and struck the North Fork when it, as well as the South Fork, was swollen with the rains, and both branches he says "were of apparently about equal magnitude," and he naturally spoke of the North Fork as "Red River." But he continued up the North Fork to its source, which he located at longitude 101° 55′. Then he took a southwesterly course till he came to the headwaters of the Prairie Dog Town (or South Fork), which he located at longitude 103° 7′ 11″, and from that time he repeatedly speaks,

in the treaty between the United States and Spain, made February 22, 1819. § 2. Said joint commission will report their survey, made in accordance with the foregoing section of this act, together with all necessary notes, maps and other papers, in order that in fixing that part of the boundary between the Territories of the United States and the State of Texas the question may be definitely settled as to the true location of the one hundredth degree of longitude west from London, and whether the North Fork of Red River, or the Prairie Dog Fork of said river, is the true Red River designated in the treaty between the United States and Spain

of that branch as the main branch. (See his report, pp. 55, 58, 84, 86, and 87.) He also entitles his Plate No. 10, which is a picture of the rock and gorge out of which the headspring of that fork flows, as "Head Ke-che-ah-que-ho-no, or the main branch of the Red River." It is manifest that, what-ever may have been his first impressions, he finally came to the conclusion, both from its greater length and size, that the South Fork is the main branch.

A reference to the letter of the Commissioner of the Land Office, hereto annexed, will show that Messrs. Brown and Jones had no doubt of the south being the main branch. The reasons they give seem to be conclusive. The width of the South Fork at the one hundredth meridian is 76 chains and 85 links; that of the North Fork 23 chains. The field-notes of the com-missioner on the part of the United States, acting under the act of June 5, 1858, of the date of August 29, 1860, say the channel of the North Fork is only 25 chains and 44 feet, and that he found "no water on the surface, (*i.e.*) the river bed, but it is found by digging 2 feet 3 inches below the surface." While in his field-notes of August 30, he says: "Struck main Red River. Main Red River where crossed, 65 chains and 38 feet; channel of running water, 22 feet 6 inches deep. Plenty of long, large lagoons of water in the bed besides the running channel."

If the data given in these reports are correct there would seem to be no doubt of the claim of the United States to the tract in dispute, and, there-fore, your committee report adversely to the bill referred to it.

But, inasmuch as the claim is disputed, and that with the earnestness of belief on the part of Texas, and inasmuch as none of the surveys re-ferred to have been made with the privity of the State of Texas, the joint commission appointed having failed to act in concert, your committee are of the opinion that that State should have a hearing in the matter, and should have an opportunity to coöperate with the United States in set-tling the facts upon which the question in dispute rests. A substitute is reported for the appointment of a joint commission, the passage of which is recommended.

made February 22, 1819; and in locating said line said commissioners shall be guided by actual surveys and measurements, together with such well established marks, natural and artificial, as may be found, and such well authenticated maps as may throw light upon the subject.  § 3. Such commissioner or commissioners, on the part of Texas, shall attempt to have said survey, herein provided for by the joint commission, made and performed between the first day of July and the first day of October of the year in which said survey is made, when the ordinary stage of water in each fork of said Red River may be observed; and when the main or principal Red River is ascertained as agreed upon in said treaty of 1819, and the point is fully designated where the one hundredth degree of longitude west from London, and twenty-third degree of longitude west from Washington, crosses said Red River, the same shall be plainly marked and defined as a corner in said boundary, and said commissioner shall establish such other permanent monuments as may be necessary to mark their work."   Gen. Laws, Texas, 1882, p. 5.

In the year 1884 the attention of the Secretary of the Interior was called to the attempted occupation of a part of the territory in dispute by white settlers, who assumed that it was a part of the State of Texas.   That officer called the attention of the Secretary of War to the subject, and suggested that as this territory had been included within the limits of the Indian Territory, and treated as part thereof for many years, the military should protect the interests of the United States.   President Arthur issued his proclamation, warning all persons from obtruding upon the lands embraced within the limits of the Indian Territory.   At the request of the authorities of Texas action was suspended to await the determination of the disputed question of boundary between that State and the United States.

At the next session of Congress the joint resolutions reported at the previous session were embodied in the act of January 31, 1885, c. 47.   That act provided :

" Whereas the treaty between the United States and Spain, executed February twenty-second, eighteen hundred and nine-

teen, fixed the boundary line between the two countries west of the Mississippi River as follows : Beginning on the Gulf of Mexico at the mouth of the Sabine River, in the sea, and continuing north along the western bank of that river to the thirty-second degree of latitude; thence by a line due north to the degree of latitude where it strikes the Rio Roxo of Natchitoches or Red River ; thence following the course of the Rio Roxo westward to the one hundredth degree of longitude west from London, and the twenty-third from Washington; thence crossing the said Red River and running thence by a line due north to the river Arkansas; thence following the course of the southern bank of the Arkansas to its source, in latitude forty-two degrees north; and thence by that parallel of latitude to the South Sea ; the whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, eighteen hundred and eighteen; and whereas a controversy exists between the United States and Texas as to the point where the one hundredth degree of longitude crosses the Red River, as described in the treaty ; and whereas the point of crossing has never been ascertained and fixed by any authority competent to bind the United States and Texas; and whereas it is desirable that a settlement of this controversy should be had, to the end that the question of boundary, now in dispute because of a difference of opinion as to said crossing, may also be settled ; therefore,

"*Be it enacted, etc.,* That the President of the United States be, and he is hereby, authorized to detail one or more officers of the army who, in conjunction with such person or persons as may be appointed by the State of Texas, shall ascertain and mark the point where the one hundredth meridian of longitude crosses Red River, in accordance with the terms of the treaty aforesaid, and the person or persons appointed by virtue of this act shall make report of his or their action in the premises to the Secretary of the Interior, who shall transmit the same to Congress at the next session thereof after such report may be made, for action by Congress." 23 Stat. 296, 297.

Under the act of Texas of 1882 and the act of Congress of 1885, the two governments appointed commissioners, but they were unable to agree upon the vital point as to whether the line which by the treaty was to follow the course of Red River westward to the 100th meridian went up the North Fork of Red River until that meridian was reached, or went westward along the Prairie Dog Town Fork to the point designated by the survey of Jones and Brown.

On the 30th day of December, 1887, President Cleveland issued a proclamation asserting that title in, and jurisdiction over, all the territory lying between the North and South Forks of the Red River and the 100th meridian, as part of the Indian Territory, was vested in the United States. That proclamation recites the fact that the commissioners appointed on the part of the United States, under the act of January 31, 1885, authorizing the appointment of a commission to run and mark the boundary lines between a portion of the Indian Territory and the State of Texas, in connection with a similar commission to be appointed by the State of Texas, had, by their report, determined that the South or Prairie Dog Town Fork was the true Red River designated in the treaty, the commissioners appointed on the part of said State refusing to concur in that report. The President admonished and warned all persons, whether claiming to act as officers of the county of Greer, in the State of Texas, or otherwise, against selling or disposing of or attempting to sell or dispose of any of said lands, or from exercising or attempting to exercise any authority over said lands, or purchasing any part of said territory from any person or persons whatsoever.

We have referred, with perhaps more fullness than was necessary, to the action, legislative and otherwise, of the two governments after the passage of the act of 1879, for the purpose of showing that, notwithstanding the passage of that act, the United States continuously asserted its rightful jurisdiction over the territory in dispute as a part of what is commonly called the Indian Territory ; and that, finally, as the only peaceful method of ending the dispute, Congress passed the act of 1890, under the authority of which the present suit was instituted.

In addition to what has been stated, we may add that the governor of Texas, in his message to the legislature of January 10, 1883, enforced the claim of his State by an exhaustive argument, covering the whole field of controversy, but without intimating that the United States, by the act of 1879 creating the Northern Judicial District of Texas, had admitted that "Greer County" was rightfully a part of Texas and subject to its jurisdiction. No one can read that message without perceiving that the author was familiar with every phase of this question of boundary. It did not occur to him that the question had been concluded by the act of Congress establishing a judicial district in the State of Texas. If he had so interpreted that act, a reference to it would have been made in the course of his presentation of the matter on behalf of his State.

In our judgment the act of Congress of 1879, establishing the Northern Judicial District in Texas, must be interpreted as meaning that the territory in dispute was placed in that district only for such judicial purposes as were competent to the courts of the United States, holden in that district, and that Texas can take nothing in the present controversy by reason of its provisions.

In support of the contention that the United States is estopped by its action to claim the territory in dispute, the answer alleges that "the Executive Department of the government of the United States has established and maintained post offices and post roads in said county, has advertised publicly for bids for carrying the United States mails over the routes in said county, designating, as defendant is advised, said post office and post roads as lying in Greer County, Texas, and not lying in the territory allotted to the Indians." In the amended bill filed by the United States it is alleged that, in 1886, after the passage of the act of 1885 providing for a commissioner to ascertain the line between Texas and the United States, as established by the treaty of 1819, and while the commissioners appointed under that act were actually engaged in their duties, certain residents of the disputed territory, describing themselves as residents of Greer County,

Texas, petitioned the Post Office Department of the United States for the establishment of post offices respectively at Mangum and Frazier, in Greer County, Texas; that in that year the prayers of the petitions were granted; that acting upon the designation of locality as set forth in such petitions such post offices were established and designated as in Greer County, Texas; but "during the same year 1886, and on the 27th day of December in said year, it was discovered by the authorities of the Post Office Department that said post offices were located in the territory in dispute; that said territory was claimed by the United States; that it was designated and outlined on the maps of the General Land Office and of the Post Office Department as not within the limits of the State of Texas, but a part of the Indian Territory of the United States; that thereupon, on the last mentioned day, in order to correct the error, the designations of those post offices were changed so as to locate them within the Indian Territory, and they have been from that date and are still only known, recognized and described in orders and official acts of the Post Office Department as located in the Indian Territory; and that all other post offices established within that territory since December, 1886, have been established, recognized and described, and are still so described and recognized, as within the Indian Territory."

It is quite sufficient to say in respect to this point that the evidence fully sustains the allegations of the amended bill, and, therefore, the designation, for a short time, of the post office referred to as being in Greer County in the State of Texas cannot, under the circumstances, be deemed of any weight in our determination of the main issue.

There is another view of the case upon which the State relies, to which much of the argument of counsel was directed. It is indicated in the following clauses of the answer filed by the State: "That in accordance with their usual custom the Spanish conquerors upon taking possession of Natchitoches and the territory lying on or adjacent to 'Rio Roxo,' established and laid out a road or route between Santa Fé, in New Mexico, and Natchitoches, now in the State of Louisiana, for

.the uses of commerce between said places, which road or route traversed the country west and northwest of Natchitoches, along the south bank of said 'Rio Roxo,' to a point now in ―――― County, Texas, then crossed said stream to its north bank, and thence along said north bank to the source of what complainant now styles the 'North Fork of Red River,' and thence to Santa Fé. That this road was for many years frequently travelled by merchants, traders, trappers, explorers and other persons trading or travelling between said points of Santa Fé and Natchitoches, and at the date of said treaty of 1819, 'Rio Roxo of Natchitoches,' from its mouth to its source, was well known to the Spaniards, as well as to the Indians and trappers of that region of country, as the stream now called Red River, having its source near the source of the Canadian River, southeast of and near to Santa Fé, in the now Territory of New Mexico; thence running in an eastern or southeastern direction, receiving in its course at intervals the waters of the False Wachita River, the Kecheahquehono or 'Prairie Dog Town River,' Pease River, Little and Big Wichita Rivers, and divers other streams, and emptying its waters into the Mississippi River, above New Orleans, in the State of Louisiana. At the date of said treaty of 1819 there was only one 'Rio Roxo of Natchitoches' known to geographers or to the people who inhabited the locality of the territory in controversy, and that was the river above described."

In a former part of this opinion we endeavored to show from early maps and printed publications that, at the date of the treaty of 1819, it was believed that the Rio Roxo of Natchitoches or Red River extended without any break from its source not far distant from Santa Fé, first southeasterly, then eastwardly, and then southeastwardly to a point near the Mississippi River. We have here in the answer filed by the State an admission that such was the fact, its position, as we have seen, being that the river that connected the country near Santa Fé with the country bordering on the Mississippi was what is now called the North Fork of Red River. This contention, the State insists, is supported by evidence of the existence of a road or route established in early times between

Natchitoches and Santa Fé, and which passed along that fork.

It is to be observed that this road or trail is not marked upon what is called the treaty map of 1818, nor upon any map that preceded it. Looking at the diplomatic correspondence that resulted in the treaty of 1819, and at the map which was before the negotiators, we find nothing to show that the existence or non-existence of a road or trail between Natchitoches and Santa Fé was an important factor in determining the boundary between the United States and Spain. So far as the record discloses, the negotiators had no knowledge of such a road or trail; and there is no substantial ground upon which to rest even a conjecture that the line was fixed with any reference to routes or trails traversed by traders and trappers. The negotiators had in mind rivers and degrees of latitude and longitude, and that fact appears on the face of the treaty. It cannot be known that they were controlled in any degree by information as to routes across the country used by traders or explorers.

Looking at maps published after the treaty was made, we find that a "great Spanish road to Red River" is marked on the Carey & Lea atlas of 1822. Leaving Santa Fé it extends in a southeasterly and easterly direction on the north side of the Canadian River to about 101° 30' of west longitude, then across that river in a southeasterly direction, crossing the False Wachita east of the one hundredth meridian, then passing southeastwardly and north of a stream which is probably the North Fork of Red River, as now known, and then eastwardly and north of Red River until it reaches and crosses Red River just east of the ninety-seventh degree of longitude. The same road is delineated on the Melish map of 1823 and the Young-Mitchell map of 1835. According to those maps each of those roads crossed Red River near the mouth of the Wachita, far east of the junction of the North Fork with Red River. If this be the trail that extended from Santa Fé to Natchitoches, or if there was a trail which, in early times, passed along the North Fork of Red River to or in the direction of Santa Fé, (upon which point the evidence

is by no means clear,) we should not necessarily conclude that such trail marked the line established by the treaty, nor that its existence proved that the river near or along which it ran was the main branch of Red River. The direction of the treaty was to follow the course of Red River *westward* to the 100th meridian. As we have seen, the treaty did not refer to any road or trail used by traders or trappers, but only to rivers and degrees of longitude. At the point where the North Fork empties into Red River there is a river which, to say the least, is as large as the North Fork, and which extends *westward*. By following the course of *that stream* to the 100th meridian the terms of the treaty are fully met, while they will not be met by departing from a westward course, before reaching that meridian, and going first in a northerly, then in an easterly, and then in a northwestwardly direction up the North Fork. The location of the line established by the treaty should be determined by the course of rivers and degrees of latitude and longitude, rather than by routes, trails or roads, the extent and character of which cannot be certainly known at this day, and over which, at the date of the treaty and prior thereto, travel by traders and trappers could have been only occasional and limited.

There are other matters to which, in view of the large amount of evidence relating to them, we must advert. Many witnesses were examined upon the question whether the Prairie Dog Town Fork or the North Fork was the longer river, which the broader and deeper stream, and which drained the most territory. The State insists, in this case, that if regard be had to width and depth of stream and extent of country drained, the North Fork must have been deemed, in early times, or when the treaty of 1819 was made, the more important of the two forks of Red River, and, therefore, that that fork should be held to be the river whose course, going from the east, was required by the treaty to be followed westward until the 100th meridian was reached.

These questions were considered by the Boundary Commission appointed after the passage of the act of Congress of January 31, 1885, c. 47. The commissioners on behalf of the

United States and Texas united in declaring that "in finding the point where the 100th meridian of west longitude crosses Red River, if it should appear that said meridian crosses Red River west of the confluence of what are now known as the North Fork and Prairie Dog Town Fork, then the true boundary should be taken at that one of those streams which best satisfies the provisions of the treaty of 1819." They concurred in holding that of those two streams the Prairie Dog Town Fork was the longer. The commissioners on behalf of the United States voted that the Prairie Dog Town Fork was the wider stream. In this view the Texas commissioners concurred, with the qualification that that stream was the "wider between the banks, but not in ordinary flow of water." The United States commissioners held that the Prairie Dog Town Fork drained a larger area than the North Fork. In this view the Texas commissioners concurred, with the qualification that "there is little or no rainfall on the sources of the stream, and hence is taken out of the usual rule of estimating the size of rivers, while the North Fork rises in the mountains, where it rains more, and its sources are living streams." House Ex. Doc. No. 21, 50th Cong. 1st Sess. pp. 165 to 168. Touching these matters, the evidence in the present case is very voluminous. Many witnesses, who had apparently equal opportunities of observation, express opinions that are directly conflicting. Governor Roberts, in his message of January 10, 1883, after referring to the disputed question as to which of these two rivers was the main branch of the Red River, said: "I have shown how nearly equal are the claims of each to be called the main branch from facts pertaining to them derived from observation. From this, either one of them, in the absence of the other, would be taken to be the main branch. It may be admitted that the South Fork [Prairie Dog Town Fork] is the larger and longer, and, therefore, the main branch in reference to the two nearly equal branches of Red River, but that admission does not settle the fact that the line must run up that branch." The true question, he said, was "which one of the two nearly equal branches corresponds most nearly with the 'Red River of Natchitoches or Red River,' as it was

known in 1819, when the treaty was made, and as 'laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, 1818.' "

We have found that the 100th meridian mentioned in the treaty must, especially since the Compromise Act of 1850, be taken to be the 100th meridian astronomically located. And we are now further considering whether the two governments intended the line, running from the east to the west, should leave Red River at the mouth of what is now known as the North Fork, and go northwardly and northwestwardly up that fork, or should go westwardly up what is now known as the Prairie Dog Town or South Fork. So far as this question depends upon evidence as to the relative width and length of these two rivers, and the extent of country drained by each, we are of opinion that, although a large number of witnesses sustain the position taken by the State, the Prairie Dog Town or South Fork, according to the decided weight of evidence, is wider and longer, and drains a much greater extent of territory than the North Fork. This is the conclusion reached by the court after a careful and patient scrutiny of all the proof. So that the evidence of living witnesses corroborates that furnished by maps, and sustains the position taken by the United States as to the scope and effect of the words in the treaty of 1819, " following the course of the Rio Roxo westward to the degree of longitude 100 west from London and 23 from Washington."

But suppose the evidence left it in doubt as to which was the wider and longer stream, and which of the two drains the largest extent of territory; and let it be assumed, as suggested by Governor Roberts, that upon the facts, derived from observation, the claims of each river to be the main branch of the Red River mentioned in the treaty are nearly equal; what, in such a contingency, is our duty? It is to ascertain which river more nearly meets the requirement that the line from the east to the west must follow " the course of the Rio Roxo *westward* to the degree of longitude 100 west from London." If, in following the course of Red River *westward* it be found that that river forks before the 100th meridian of longitude

is reached — one of the forks coming from the north and northwest, and the other from the west — it would seem to be our duty to hold that the river coming from a westward direction was the one whose course the treaty directed to be followed. Those who insist that the course should be *north and north-westwardly* for any material distance from the main river to the 100th meridian, are under an obligation to sustain that position by such evidence as would justify the court in departing from the plain direction of the treaty to follow the Red River "westward" to the named meridian. But that has not been done.

Much stress has been laid by the State upon the testimony of the late General Marcy given before the Boundary Commission of 1886. In the year 1852 that officer, being then a captain in the United States Army, was directed by General Scott to make an examination of the Red River and the country bordering upon it from the mouth of Cache Creek to its source. During his explorations he camped, on the 30th of May, 1852, at a certain point on Red River, and in his daily journal of his movements said: "Red River at this place is a broad, shallow stream, six hundred and fifty yards wide, running over a bed of sand. Its course is nearly due west to the forks, and thence the course of the south branch is W. N. W. for eight miles, when it turns to nearly N. W. The two branches are apparently of about equal magnitude, and between them, at the confluence, is a very high bluff, which can be seen for a long distance around." Senate Ex. Doc. No. 54, 32d Cong. 2d Sess. p. 20. We take it that, in his reference to the forks of Red River, he had in mind the Prairie Dog Town Fork and the North Fork.

Thirty-two years later, that is, in 1886, Captain, then General, Marcy appeared as a witness before the Boundary Commission. He referred to his report of 1852, and said: "As the time that has elapsed since I made that exploration (thirty-three years) is so great, many of the facts and events connected therewith have passed from my memory; but some matters relative to the objects for which this commission was convened, as I understand, may not be found in the report.

I have this morning, for the first time, seen a copy of that portion of Melish's map of the United States, embracing the part of the Red River country which the commission has under consideration at this time, which is authenticated by the signature of the Secretary of State of the United States. Upon this map only one large fork of Red River is delineated, with one more northerly small affluent, which is not named, but may have been intended for Washita River or Cache Creek." House Ex. Doc. No. 21, p. 59.

That the full force of General Marcy's statements may appear we here give so much of his deposition as is embodied in the brief filed by counsel for the State:

"I regarded the Prairie Dog Town branch as the main Red River, for the reason that its bed was much wider than that of the North Fork, although the water only covered a small portion of its bed, and as the sandy earth absorbed a good deal of water after it debouched from the cañon through which it flows, it may not contribute any more water to the lower river than the North Fork. The Prairie Dog Town branch and the North Fork of Red River, from their confluence to their sources, are of about equal length — the former being 180 miles and the latter 170 miles in length. For reasons which I will presently state, I have been unable to resist the force of my own convictions, that the branch of Red River that I called the North Fork of that stream was what is designated upon Melish's map as Rio Roxo. I doubt if the Prairie Dog Town River was ever known to civilized men prior to my exploration in 1852; and, if it was ever mapped before then, I am not aware of it. The character of the country through which this stream flows is such that travellers would not have been likely to pass over it when there was a much more favorable route north of the North Fork. The water in the Prairie Dog Town branch, from its confluence with the North Fork to within two miles of its head spring (about 100 miles), I found so bitter and unpalatable that many of the men became sick from drinking it. But one pool of fresh water was found throughout the entire distance, and the Indians told me they never went up this stream

with their families if it could be avoided, for the reason that
the nauseous water frequently proved fatal to their children.
Hence, it is not surprising that but little, if anything, should
have been known of this repulsive region before my explora-
tion in 1852. And this probably accounts for the entire ab-
sence of most of its southern branches upon Melish's map. It
is very certain that the 'Prairie Dog Town River' was never
delineated by any Spanish, French or English name, as were
most of the other streams in that country, and it was only
known to the Indians, and possibly to some Mexican traders,
as 'Kecheahquehono,' a Comanche appellation, the significa-
tion of which the Delawares informed me was 'Prairie Dog
Town River.' . . . As before stated, owing to the absence
of good water, the sandy character of the soil along the river,
and the formidable obstruction presented by the elevated and
staked plain, and the extensive belt of gypsum crossing this
route, the Mexicans would never have attempted to traverse
it with their carts in their trading expeditions from Santa Fé
to Natchitoches, especially when there was so good a route a
little further north, possessing all the requirements for prairie
travelling. The Rio Roxo upon Melish's map is almost en-
tirely south and west of the Wichita Mountains, but in close·
proximity to them — which is in accord with my determina-
tion of the position of the North Fork, while there are no
mountains upon the Prairie Dog Town branch. The head of
the Rio Roxo upon Melish's map is put down as in about lat-
itude 37°, while upon my map the true latitude is 35½°, while
the Prairie Dog Town River rises in about thirty-four and
one-half degrees; so that, if his Rio Roxo was intended to
represent the 'Prairie Dog Town River,' it would be two and
one-half degrees of latitude too far north." House Ex. Doc.
No. 21, pp. 59, 60.

It thus appears that at the time (1852) General Marcy made
his exploration of the Red River country he regarded the
Prairie Dog Town River as the main Red River, and his con-
clusion then formed by actual observation was in harmony
with the maps that had been previously given to the public.
After many of the facts connected with the subject had, as he

frankly admitted, passed from his memory, he expressed the opinion that the river that he had called the North Fork of Red River was what was designated on Melish's map of 1818 as Rio Roxo. However persuasive his reasons, for that conclusion might be regarded, if the facts then stated by him were alone taken into consideration, they do not satisfy us that he was in error when, the facts being fresh in his mind, he expressed the opinion, from personal examination on the ground, that Prairie Dog Town Fork was the main Red River. One of the reasons assigned, in support of his last view of this question, is that Prairie Dog Town River was never delineated upon any map of this country or of Europe prior to his exploration, and that it was only known to the Indians, and possibly to some Mexican traders, as the Kecheahquehono, which means Prairie Dog Town River. Now it is quite true that no map, prior to 1852, *marked* any river *as Prairie Dog Town River*, or as the Kecheahquehono. But it is shown, beyond all question, that on all the maps above referred to which appeared after 1819 and down to the time when General Marcy testified before the Boundary Commission, a river was marked whose course (going from east to west) is substantially westward from the point where the line from the Sabine River meets the 32d degree of latitude to the 100th meridian, and that the line, thus delineated, extending to and westwardly beyond the true 100th meridian, is the southern boundary of the Indian Territory, *as that boundary is claimed by the United States.* Between the mouth of the North Fork and the initial monument established by the government in 1856, there is a river whose course is substantially east and west. *That river* is *marked* on Long's map of 1822 and the Melish map of 1823, west of the 100th meridian, as " Rio Roxo or Red River;" on Finley's map of 1826 as " R. Roxo or Red R. ;" on the Young-Mitchell map of 1835, and Maillard's map of 1841 as " Rio Roxo or Red River of Louisiana ;" and on Mitchell's map of 1851 as " Red River." On all the other maps the same river is plainly delineated. That the name of Prairie Dog Town Fork does not appear on maps published prior to 1852, or that that name was not known to civilized people until after the explora-

tions made by Captain Marcy, is not therefore a circumstance of serious moment, certainly not conclusive. The river itself, though unnamed on any map prior to 1852, was in fact delineated on maps for more than a quarter of a century before that officer entered the Red River country with his company.

The character of the country through which the Prairie Dog Town River flowed and the bad quality of its water for drinking purposes, are also referred to by General Marcy as reasons why the North Fork should be regarded as the stream whose course was intended to be followed in establishing the boundary. We do not think that the evidence upon this point is entitled to very great weight. There is no reason to suppose that the negotiators of the treaty had any knowledge or information as to the relative qualities for drinking purposes of the waters of the two streams in question; and if they had, it is difficult to perceive why such facts would control the determination of a disputed question of boundary between two nations. The negotiators knew or believed that there was a Red River, whose source was not far from Sante Fé, and which, in its course, passed Natchitoches. Their purpose was to establish a line which would extend from the point where the line due north from Sabine River met Red River, thence along and up Red River "westward" to the 100th meridian of longitude, then due north to the Arkansas River. The reference in the treaty was to rivers and degrees of longitude and latitude. It was a question of territory without regard to a special trail, the location of which might have been affected by the quality of the waters of any particular stream.

Much significance is attached by the State to the fact that as early as 1860, by legislative enactment, it created the county of Greer with boundaries that include the whole of the territory in dispute, and that it has ever since asserted its jurisdiction over both that territory and the people who inhabit it. However important such facts might under some circumstances be deemed, it must be remembered that during the whole of the period referred to the constituted authorities of Texas have been aware that the United States regarded the territory in dispute as under its exclusive jurisdiction and as a part of what

is known as the Indian Territory. The government has always disputed the claim of Texas. The only qualification of this broad statement is that suggested by the language inadvertently used in the act of Congress creating the Northern Judicial District of Texas. But that language, we have held, was not intended to express the purpose of the United States to surrender its jurisdiction over the territory in dispute.

It is also said that many titles to land in the disputed territory are held under the State and that much confusion may follow, and injustice be done to individuals, if the claim of the United States be sustained. On the other hand, it is to be inferred that there are many settlers in the disputed territory who assert title to land under the United States. It appears in evidence that in 1873 and 1874 a part of that territory was sectionized under the authority of the General Government. We suppose that Governor Roberts referred to that fact when, in his message of 1883, he said that "the authorities of the United States had established an initial corner on the South Fork of Red River, on the line claimed to be the 100th degree of longitude, had sectionized the country east of that line, and protected it from settlement of white people as a part of the Indian Territory." He further said: "Application was made to me to know if I would sign the patents, if certificates were located and surveyed in Greer County. Under the then existing circumstances I felt it to be my duty to discourage such locations, as they might be to our prejudice in the settlement of our claim with the United States, when the merits of it could be more fully ascertained." But whatever may be the facts bearing upon this point, our duty is to determine the present issues according to the settled principles of law, without reference to considerations of inconvenience to individuals residing in the disputed territory. We cannot doubt that the Congress of the United States will do all that justice requires to be done in order to avoid any injury to individuals that ought not to be inflicted upon them.

It is further said that the State, since it assumed to create Greer County, has expended a large amount of money in pro-

viding a public school system for the inhabitants of that locality. To what extent moneys have been so expended is not clearly shown. Whatever may be the facts, touching this point, we do not feel at liberty to give weight to them in this case. The question before us, we repeat, is one of law, and must be determined according to law. What may be fairly and justly demanded by the State, on account of moneys expended for the benefit of the inhabitants of the disputed territory, is a matter for the consideration of the legislative branch of the National Government.

In the argument it was suggested that this court ought not to forget how much was added to the power and wealth of this nation when Texas, with its imperial domain, came into the Union, and her people became a part of the political community for whom the Constitution of the United States was ordained and established. This fact cannot, of course, be forgotten by any American who takes pride in the prestige and greatness of the Republic. But the considerations which it suggests cannot affect the decision of legal questions, and must be addressed to another branch of the Government. The supposition is not to be indulged that that department of the Government will fail to recognize any duty imposed upon it by the circumstances arising out of this vexed controversy.

For the reasons stated the United States is entitled to the relief asked. And this court now renders the following decree :

*This cause having been submitted upon the pleadings, proofs and exhibits, and the court being fully advised, it is ordered, adjudged and decreed that the territory east of the 100th meridian of longitude, west and south of the river now known as the North Fork of Red River, and north of a line following westward, as prescribed by the treaty of 1819 between the United States and Spain, the course, and along the south bank, both of Red River and of the river now known as the Prairie Dog Town Fork or South Fork of Red River until such line meets the 100th meridian of longitude — which territory is sometimes*

*called Greer County — constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that State into the Union, and is not within the limits nor under the jurisdiction of that State, but is subject to the exclusive jurisdiction of the United States of America. Each party will pay its own costs.*

MR. JUSTICE PECKHAM, not having been a member of the court when this case was argued, took no part in the decision.